267 N.J. Super. 139 (1993)
630 A.2d 862
UTILIMATIC, INC., A CORPORATION OF THE STATE OF NEW JERSEY, PLAINTIFF,
v.
BRICK TOWNSHIP M.U.A., DEFENDANT. UTILIMATIC, INC., A CORPORATION OF THE STATE OF NEW JERSEY, PLAINTIFF,
v.
LAKEWOOD TOWNSHIP MUNICIPAL UTILITY AUTHORITY AND WATER SPECIALTIES, INC., DEFENDANTS.
Superior Court of New Jersey, Law Division Ocean County.
Decided June 18, 1993.
*142 Vincent P. Trovini for plaintiff (Breslin & Trovini, attorneys).
Damian G. Murray for defendant Brick Township Municipal Utilities Authority.
Norman D. Smith for defendant Lakewood Township Municipal Utilities Authority.
Craig L. Wellerson for defendant Water Specialties, Inc. (Dasti, Murphy & Wellerson, attorneys).
SERPENTELLI, A.J.S.C.
This action in lieu of prerogative writs involves a novel issue arising out of the interpretation of Section 13 of the Local Public Contracts Law, N.J.S.A. 40A:11-1 to -48, and its application to alleged "lock out" or "sole source" bidding specifications.
Plaintiff, Utilimatic, Inc. ("Utilimatic"), filed a suit against defendant Brick Township Municipal Utilities Authority ("BTMUA" or "Authority") and a second action against defendant Lakewood Township Municipal Utilities Authority[1] ("LTMUA" or "Authority"), and defendant Water Specialties, Inc. ("Water Specialties") alleging in both cases a failure to award a contract for water meters to Utilimatic as the "lowest responsive bidder." The matters were consolidated by court order dated March 20, 1992.
Both the BTMUA and the LTMUA advertised for bids for the purchase of water meters. Each Authority received three bids. Utilimatic, bidding Kent brand meters, was the lowest bidder in each instance. However, each Authority rejected Utilimatic's bid as nonresponsive and awarded the contract to the second lowest bidder, Water Specialties, which bid the Sensus SR-I brand *143 meter.[2]
The BTMUA cited three reasons for rejecting the Utilimatic bid. It was alleged that Utilimatic did not satisfy the specifications concerning the "register," the "magnetic coupling," and the "measuring chamber." The LTMUA also cited the first two reasons but not the third in rejecting Utilimatic's bid. The two specifications which the BTMUA and the LTMUA relied upon in finding Utilimatic was nonresponsive contained identical language in each bid notice:
A) Register: "All reduction gearing and the generator shall be contained in a permanently hermetically sealed, tamperproof enclosure made from a corrosion resistant material and shall be secured to the upper main case by means of a locking device located in the interior of the meter so the register cannot be removed externally (emphasis added)."
B) Magnetic Coupling: "The motion of the piston shall be transmitted to the sealed register through the use of a direct magnetic drive without any intermediate magnetic coupling (emphasis added)."
The third deficiency, cited only by the BTMUA, involved the measuring chamber and was described in its specifications in part as:
"C) Measuring Chamber: `The chamber's division plate shall be stainless steel with a bonded rubber coating' (emphasis added)."
The principal issue raised by this challenge is whether the defendants' specifications are valid or, conversely, whether the defendants advertised for a "brand name" in the guise of "lock out" or "sole source" specifications. The resolution of these questions turns on the application of N.J.S.A. 40A:11-13, specifically subsections (a) and (d), and the second to last unlettered paragraph of the statute.
The opening paragraph of N.J.S.A. 40A:11-13 bespeaks a fundamental tenet underlying our bidding laws in that it requires bid specifications to be "drafted in a manner to encourage free, open *144 and competitive bidding." To ensure that goal is attained, the statute expressly prohibits certain bidding procedures:
Subsection (a) disallows any specifications which:
Require any standard, restriction, condition or limitation not directly related to the purpose, function or activity for which the purchase, contract or agreement is made....
Subsection (d) provides that specifications may not:
Require, with regard to any purchase, contract or agreement, the furnishing of any "brand name," but may in all cases require "brand name or equivalent,"....
The second paragraph of N.J.S.A. 40A:11-13(e) states:
Any specification adopted by the governing body, which knowingly excludes prospective bidders by reason of the impossibility of performance, bidding or qualification by any but one bidder, except as provided herein, shall be null and void and of no effect and subject purchase, contract or agreement shall be readvertised, and the original purchase, contract or agreement shall be set aside by the governing body.
The present statutory provisions are reflective of long established principles of common law. The purpose of the bidding laws is to protect the public by placing bidders on an equal footing and to ensure that competition will eliminate the possibility of fraud, extravagance or favoritism in the expenditure of public funds. Shakel v. North Bergen Tp., 37 N.J. 369, 378-79, 181 A.2d 473 (1962). To conform with statutory requirements, bid specifications for public contracts:
... shall be sufficiently full and explicit to notify prospective bidders of the kind and nature of the subject of the contract and set up a common standard of competition, in short, supply such information as will afford all bidders a fair and reasonable opportunity for competition and enable them to bid intelligently.
[Camden Plaza Parking, Inc. v. City of Camden, 16 N.J. 150, 159, 107 A.2d 1 (1954) (citations omitted).]
Bidders are induced to participate by the promise of impartiality which only quality specifications can insure. Greenberg v. Fornicola, 37 N.J. 1, 178 A.2d 339 (1962). Our Supreme Court in Wazen v. Atlantic City, 1 N.J. 272, 63 A.2d 255 (1949), cautioned against deviation from this well ingrained doctrine.
The rule is one which is rooted deep in sound principles of public policy by general application. It should be rigidly adhered to by the courts and not frittered away by a careless or indifferent application to specifications that are not clear, precise *145 and definite on all matters that are material to the proposals, to which bidders are invited to compete. The necessity of having a common standard and the importance of definite and precise specifications upon which to found corporate action are too apparent to require argument. [Id. at 283-84, 63 A.2d 255.]
Thus, the statutory and case law directs the court to balance the right of the bidding agency to draw detailed and exacting specifications against the potential for fraud, extravagance or favoritism in order to ensure a level playing field for all potential bidders. The law does not require that bid specifications be so general in description that every supplier of a product can bid the contract thereby depriving an agency of the type and quality of goods to which it has become accustomed. On the other hand, the specifications cannot be so precise as to knowingly exclude all but one prospective bidder.
All of defendants' witnesses argued that the challenged bid specifications are important and reasonable water meter requirements. The plaintiff disagreed stating that the features are essentially cosmetic or, alternatively, that the Kent meter has the functionally equivalent characteristics. The register in both the Kent and SR-I meters sits at the top of each meter. It contains the mechanisms needed to record water usage and is housed in a clear plastic covering which is attached to a cast iron casing. The Kent register is secured to the casing by an external collar. The SR-I register is held in place by an internal device which extends from the register through the casing and is fastened to the casing by a nut. Paul Morrill, the LTMUA Engineer, testified that although no meter is entirely tamperproof, he prefers an interior locking device, as opposed to an exterior one, since it creates a less visibly inviting and a more difficult task for the user who may want to disengage the register. The BTMUA witnesses agreed with the LTMUA assessment.
Additionally, George Anderson, Vice President of Quality and Director of Engineering at Sensus, testified that if the register is removed on the SR-I meter, water will leak through the opening at the top of the casing thereby evidencing tampering. Since the *146 Kent meter casing is sealed at the top, the removal of the register will not cause a leak and, therefore, not reveal any meddling. The Authorities claim that the Kent register can be loosened merely by unscrewing the bolt in the collar which holds the register in place and that a slight repositioning of the register would interrupt its function and allow water to flow unrecorded. In contrast, according to the Authorities, an attempt to loosen the SR-I register from the top of the meter by twisting it would leave definitive signs of damage in the form of grooves on the base of the register cup, thus creating a telltale sign of tampering.
Thomas Hynes, President of Utilimatic, stated that any alleged advantages of the interior locking device could be defeated by dropping the bottom plate of the SR-I meter and removing the measuring chamber because that would also allow water to flow unregistered. He concluded that the internal locking mechanism is merely a marketing device. The Authorities contended that dropping the plate was a more difficult procedure than loosening the collar on the Kent meter for several reasons. They pointed to the presence of a yoke under most of the SR-I meters which makes removing the bottom plate troublesome, the location of some meters in users homes which makes it difficult to access the plate and the increased likelihood of detecting signs of tampering inherent in the process of disassembling the meter, removing the measuring cup and thereafter attempting to reassemble the meter.
Testimony also revealed that each Authority's witnesses preferred a direct magnetic drive without any intermediate magnetic coupling because they thought an indirect coupling could wear out more quickly and reduce the accuracy of a meter over time. The direct magnetic coupling results from the connection between the piston in the measuring chamber and the register. The Kent meter has two distinct sealed parts, the register and the casing. The register records water usage as a result of the interaction of a wet magnet in the casing and a dry magnet in the register. The two magnets do not have direct contact with each other. Gregory Hannah, Operations Manager for the BTMUA, stated that the *147 Authority had used meters similar to the Kent design and had found that a spindle utilized in the indirect coupling had sometimes broken off and permitted the continued flow of unregistered water. In response, Hynes argued that the coupling in the Kent meter was the functional equivalent of the SR-I coupling.
The BTMUA's specifications additionally required a stainless steel division plate, located in the measuring chamber, with a bonded rubber coating as opposed to a plastic division plate bonded with something other than rubber. The division plate aids in the proper travel of the piston which, in turn, is responsible for transferring water flow measurements to the register. It was alleged that plastic plates are subject to warping, thereby affecting the travel of the piston and the accuracy of a register's measurements. The LTMUA did not utilize this specification but now also believes that a stainless steel division plate bonded with a rubber coating will contribute to greater longevity and accuracy of a meter. Again, Hynes stated that the plastic division plate in the Kent meter is the equivalent to the Sensus plate.
Whoever may be right regarding the three areas in dispute, the court concludes that the defendants have adequately established the materiality of the challenged bid specifications thereby satisfying N.J.S.A. 40A:11-13(a). The evidence presented by each Authority supports a finding that its representatives believed in good faith that the three characteristics in question related to important considerations such as tamper resistancy, accuracy in measuring water use, meter longevity and loss of revenue through unmetered water. Thus, the court must turn to the question of the validity of the bid specifications in the face of the allegation that they wrongfully precluded the plaintiff from submitting a conforming bid.
As noted, N.J.S.A. 40A:11-13 provides that if a government agency, through its bid specifications, "knowingly" excludes prospective bidders by reason of impossibility of performance, bidding or qualification by any but one bidder, then the specifications shall be null and void and the original award of the contract should be *148 set aside. The statute does not define the word "knowingly." If it is narrowly construed, those drawing the bid specifications can disclaim any intention of locking out bidders simply by asserting that they just did not know whether more than one prospective bidder existed. Read that way, "knowingly" becomes "intentionally" and requires a bidder who claims to have been locked out to prove guilty knowledge, an intention to exclude. Given the spirit and purpose of the bidding law, that puts the burden on the wrong party.
Rather, if the purposes of the bidding laws as described earlier are to be fulfilled, the word must be given a more expansive definition. Thus, the term "knowingly" must be interpreted to mean that if the agency soliciting the bid should have reasonably known that only one bidder could satisfy the specifications, then the agency should seek bids for the brand name or the equivalent of that product. If there is any doubt, then the agency is under an obligation to determine whether competitive bidding can be achieved.
The testimony revealed that the engineers for the respective Authorities used language from Rockwell International literature (the predecessor of Sensus) in drafting the specifications in dispute. Witnesses for the Authorities stated that they had used the Rockwell or Sensus meters in the past and that they preferred the challenged features for reasons of longevity, accuracy and tamper resistancy. Both Authorities presently have many SR-I meters in use, have contracted regularly for Sensus meters in recent years and clearly hope to continue that practice. They are obviously well satisfied with the product.
The Authorities' witnesses could not say definitively whether the SR-I meter was the only water meter produced at the time of bid advertising which could satisfy the specifications. They testified that it was not inconceivable that other manufacturers have or could produce water meters similar to those described in the bid specifications. The technology employed is not patented or so high-tech that another manufacturer could not create a meter to *149 match the bid specifications. Cf. Bauer v. West Hoboken, 90 N.J.L. 1, 4, 100 A. 223 (Sup.Ct. 1917).
Utilimatic notified the BTMUA, after it opened the bids, and the LTMUA, before it opened the bids, that only one bidder could meet the specifications as drawn. Additionally, the Authorities' witnesses have been associated with the water meter business for years and can be presumed to be knowledgeable as to the type and characteristics of available meters. They did not testify to inquiring of any trade association or other utility authorities prior to drawing the specifications to determine whether there would be any competition. The inferences the court draws from the evidence as a whole is that, while the Authorities' representatives may not have known in fact that no other source existed, they should have realized it was unlikely that another bidder would come forward to meet the specifications and that the result would be to "lock out" or "sole source" other bidders.
Generally speaking, public bodies should be able to bid and ultimately purchase the type and character of the products they desire. However, that right is tempered by the policies of the bidding laws. As discussed above, a bidding agency is free to designate a specific product by brand name in bid specifications as long as the dictates of N.J.S.A. 40A:11-13(d) are followed. That portion of the statute requires a municipal agency to actually designate the brand name in the bid specifications as opposed to simply describing the attributes of the product. Furthermore, the agency must allow for the bidding of the functional equivalent of the brand name. If the agency fails to do so, the contract must be voided. The prohibition against specifications requiring the use of a particular manufacturer's brand without allowing for its equivalent is obviously designed to service the overriding legislative policy of awarding public contracts through competitive bidding. Morie Energy Management v. Badame, 241 N.J. Super. 572, 577, 575 A.2d 885 (App.Div. 1990) (citing Hillside Tp. v. Sternin, 25 N.J. 317, 322, 136 A.2d 265 (1957)). The inclusion of the second to last unnumbered paragraph in N.J.S.A. 40A:11-13, prohibiting the *150 knowing exclusion of all but one bidder, prevents the bidding agency from doing indirectly through tailored specifications what it cannot do directly through exclusive brand name requirements.
Both Authorities strongly favored the Sensus SR-I meter. That being so, the specifications could have included the brand name or its equivalent. Impliedly, the specifications incorporated the SR-I meter but failed to state "or equivalent." Therefore, the court finds that both specifications are invalid.
The Authorities are, of course, free to rebid by brand name or equivalent. However, since the parties presented extensive testimony concerning functional equivalency, judicial efficiency suggests that the court should comment on that issue, even though whatever is said is clearly dictum. It must also be recognized that Utilimatic offered only the testimony of its President and no other expert concerning this subject.
In the court's view, the weight of the evidence leads to the conclusion that the Kent meter is not the functional equivalent of the SR-I meter. The SR-I has features which the Kent meter cannot match and which the Authorities, in the exercise of their reasonable judgment, consider essential. The internal locking device in the Sensus meter is clearly more tamper-resistant than the Kent collar. Both the testimony and in-court demonstrations support that finding as does the common sense conclusion that the effort involved in successfully tampering with the Sensus SR-I is significantly greater than merely turning the bolt on the Kent collar and slightly realigning its register. Furthermore, the weight of the evidence gives credence to the Authorities' claim that the direct magnetic drive without any intermediate magnetic coupling and the stainless steel division plate with a bonded rubber coating were likely to result in superior meter accuracy and longevity.
The contract awarded to Water Specialties by the LTMUA is hereby vacated. Both Authorities may advertise bids for Sensus brand or equivalent or otherwise solicit bids in conformity with the *151 Local Public Contracts Law. Mr. Smith may submit an order under the five day rule as to both consolidated actions.
NOTES
[1] The Lakewood Township Municipal Utilities Authority is incorrectly designated in the complaint as the Lakewood Township Municipal Utility Authority.
[2] The BTMUA subsequently vacated the award of the contract to Water Specialties and is now awaiting the outcome of this litigation before it readvertises for new bids.