695 A.2d 1381

NATIONAL WASTE RECYCLING, INC. AND JOHN GRYWALSKI, PLAINTIFFS, AND DEPARTMENT OF ENVIRONMENTAL PROTECTION AND DIVISION OF LOCAL GOVERNMENT SERVICES, INTERVENORS–APPELLANTS, v. THE MIDDLESEX COUNTY IMPROVEMENT AUTHORITY AND WASTE MANAGEMENT OF NORTH JERSEY, INC., DEFENDANTS–RESPONDENTS.

Argued February 18, 1997—Decided July 17, 1997.

210

*Regina H. Nugent*, Deputy Attorney General, argued the cause for intervenors-appellants (*Peter G. Verniero*, Attorney General of New Jersey, attorney; *Andrea M. Silkowitz*, Assistant Attorney General, of counsel).

*Jonathan L. Williams* argued the cause for respondent Middlesex County Improvement Authority (*DeCotiis, Fitzpatrick & Gluck*, attorneys; *Benjamin Clarke*, on the brief).

*Robert S. Moraff* argued the cause for respondent Waste Management of North Jersey, Inc. (*Schwartz, Tobia, Stanziale, Becker, Rosensweig & Sedita and Ambrosio, Kyreakakis, DiLorenzo, Moraff & McKenna*, attorneys).

The opinion of the Court was delivered by

STEIN, J.

Under the Local Public Contracts Law (LPCL), *N.J.S.A.* 40A:11–1 to –49, local public entities must submit any proposed purchase of goods or services in excess of $7500 to public advertisement and bidding. *See N.J.S.A.* 40A:11–3, –4. The LPCL provides a number of exemptions from the bidding requirement. *See N.J.S.A.* 40A:11–5. *N.J.S.A.* 40A:11–5(1)(s) provides an exemption from the public bidding requirement for "[t]he marketing of recyclable materials recovered through a recycling program...." In a reported decision, the Appellate Division reversed a trial court's ruling that invalidated a five-year contract, which included the curbside collection and marketing of recyclable materials in Middlesex County, between defendants Middlesex County Improvement Authority (MCIA) and Waste Management of North Jersey, Inc. (WMNJ), on the ground that the curbside collection aspect of the contract had not been publicly bid contrary to the LPCL. *See* 291 *N.J.Super.* 283, 287, 289–95, 677 *A.2d* 268 (1996). The Department of Environmental Protection (DEP) and the Division of Local Government Services (DLGS) (collectively intervenors) petitioned the Court for certification on the issue whether the Appellate Division panel had erroneously concluded

that the MCIA/WMNJ integrated recycling contract fell within the scope of the exemption from public bidding provided by *N.J.S.A.* 40A:11–5(1)(s). We granted the intervenors' petition for certification, 146 *N.J.* 565, 683 *A.*2d 1161 (1996).

## I

The essential facts are undisputed. Pursuant to the Solid Waste Management Act (Act), *N.J.S.A.* 13:1E–1 to –207, each county in New Jersey and the Hackensack Meadowlands District is required to implement a solid waste management plan regulating the disposal of all solid waste generated within its borders. *See N.J.S.A.* 13:1E–19 to –23. A 1987 amendment to the Act, known as the New Jersey Statewide Mandatory Source Separation and Recycling Act (Recycling Act), *L.* 1987, *c.* 102 (codified at *N.J.S.A.* 13:1E–99.11 to -.32), requires that every county's solid waste management plan must include a recycling component. *See N.J.S.A.* 13:1E–99.13. Initially, the Legislature set the mandatory recycling goal at twenty-five percent of the total waste stream generated. *L.* 1987, *c.* 102, § 3. In 1992, it increased that goal to require by December 31, 1995, at least sixty percent recycling. *L.* 1992, *c.* 167, § 1 (codified at *N.J.S.A.* 13:1E–99.13).

Pursuant to that legislative requirement, the Middlesex County Board of Chosen Freeholders amended the recycling plan of Middlesex County (County) on June 2, 1994, to achieve the sixty percent goal within the specified time period. The amended plan, approved by the DEP on October 3, 1994, required that a private contractor be chosen to implement the recycling program on behalf of all municipalities electing to participate, and designated MCIA as the local agency responsible for the program's implementation.

On October 14, 1994, MCIA publicly issued a Request for Qualifications (RFQ) for the "Collection and Marketing of Source-Separated Recyclable Materials, Including the Processing and Transfer Services Necessary for such Marketing." Critical to the issue requiring resolution in this appeal, the RFQ specified that

the successful respondent would be responsible both for the curbside collection of all recyclable materials and for their ultimate sale or other disposition. The RFQ specified the schedule for collection and the materials to be collected; provided that the successful respondent would be responsible for negotiating and entering into contracts for the sale or disposition of the recyclables collected; and, finally, required that the successful respondent would be responsible for supplying sufficient equipment to provide recycling and marketing services.

Additionally, the RFQ stated MCIA's preference to select two contractors to service the participating municipalities in the County: one contractor for the northern and one contractor for the southern sections of the County. However, it provided that one contractor could be selected for the entire County if the contractor could demonstrate that it was capable of servicing the entire County efficiently and at a lower cost.

MCIA received responses from ten companies, six of which met its qualifications. Plaintiff National Waste Recycling, Inc. (National) and Defendant WMNJ were among those found to be qualified. On November 30, 1994, MCIA issued a Request for Proposals (RFP) to the six qualified companies. Five of those companies, including National and WMNJ, submitted proposals. National submitted a proposal to service the southern portion of the County; WMNJ submitted a proposal to provide services for the entire County or any portion thereof.

Pursuant to the RFP, MCIA conducted a preliminary review and evaluation of the proposals, ranking National and WMNJ highest after considering the cost proposals, technical proposals, contractual proposals and the financial condition of each company. MCIA then entered into negotiations with both companies. MCIA representatives met separately with National and WMNJ to negotiate terms, exploring each candidate's willingness to make price concessions. During the negotiation process, each candidate was apprised of the price terms proposed by the other. One major concession that MCIA obtained from both National and WMNJ

was a guaranteed "floor price" to be paid to the County for the recyclable materials.

On February 8, 1995, MCIA awarded the five-year $22,000,000 contract to WMNJ based on the recommendation contained in a written evaluation of the two proposals. The evaluation was prepared by a Project Team that included a consulting engineer, special legal counsel and a financial advisor. MCIA's executive director certified that its decision was premised on the fact that WMNJ's final proposal for the entire County represented the lowest five-year cost to MCIA. WMNJ's contract price for the entire County was lower by $259,520 than the aggregate cost the County would incur if the MCIA awarded National the contract for the southern section of the County and WMNJ had been selected to provide services for the northern section of the County. Another factor that tipped the balance in favor of WMNJ was that, despite repeated requests by MCIA, National had failed to furnish an audited financial statement, which was one of the conditions under which MCIA had agreed to qualify National. The negotiation process itself resulted in a total savings to the County of approximately $5,500,000.

On February 21, 1995, plaintiff National filed suit against defendants MCIA and WMNJ, seeking a temporary injunction and invalidation of the contract. John Grywalski, a Middlesex County resident, joined National as a plaintiff. Plaintiffs' amended complaint asserted three separate challenges to the validity of the contract. This appeal focuses on the claim that the contract was invalid because it had been awarded without public bidding of the curbside collection portion of the contract, in violation of the LPCL. See *N.J.S.A.* 40A:11-3, –4.

Defendants moved for summary judgment, arguing that plaintiffs lacked standing and that their claims lacked merit as a matter of law. Concerning the standing issue, defendants asserted that New Jersey law estops a party from challenging the validity of the process used to award a contract when that party had participated without complaint in that very process until a decision contrary to

its interests was reached. Defendants argued that this rule applied to both National and Grywalski, because discovery had revealed that Grywalski was a personal friend of one of the principals of National and that he was not spending any personal funds to prosecute the lawsuit. Concerning the merits of the bidding issue, defendants asserted that the contract was exempt from public-bidding requirements pursuant to *N.J.S.A.* 40A:11–5, which provided:

> Any purchase, contract or agreement of the character described in [section 4 of the LPCL] of the act may be made, negotiated or awarded by the governing body without public advertising for bids and bidding therefor if:
>
> (1) The subject matter thereof consists of:
>
> . . . .
>
> (s) The *marketing* of recyclable materials recovered through a recycling program or the marketing of any product intentionally produced or derived from solid waste received at a resource recovery facility or recovered through a resource recovery program, including, but not limited to, refuse-derived fuel, compost materials, methane gas, and other similar products.
>
> [emphasis added.]

The trial court held that National was barred from contending that the contract required public bidding because it had actively participated in the procurement process. However, the trial court found that, although it was troubled by the facts and circumstances surrounding Grywalski's participation in the lawsuit, Grywalski had standing based on his status as a taxpayer and "potential user of this county-wide recycling program."

Concerning the merits of plaintiffs' claim, the trial court stated that "in matters of discretion courts must give very respectable deference to the decision and the judgments of [public] authorities." However, it found that that principle was outweighed by the strong public policy favoring public bidding and the corollary requirement that "exceptions to the bidding statute must be interpreted narrowly." The trial court concluded that the curbside collection obligation under the contract did not fit within the *N.J.S.A.* 40A:11–5(1)(s) bidding exception, construing the exception to refer only to the marketing of materials recovered from a

recycling program, specifically, the post-collection phase of the recycling process, stating:

> The exception applies to "the marketing of recyclable materials recovered through a recycling program." ...
>
>> The exception distinguishes between marketing and recovery in its very terms. Any fair reading of that language ... indicates that it clearly contemplates recovery of recyclables through a recycling program, followed by marketing. It is the marketing phase of the operation which the statute says need not be bid.

The court found the contract void and ordered that it be set aside. The parties consented to a dismissal without prejudice of plaintiffs' remaining claims. Defendants successfully moved for a stay pending appeal.

Defendants MCIA and WMNJ appealed the trial court's judgment. While the appeal was pending, the Attorney General, acting on behalf of the Division of Solid Waste Management (DSWM) of the New Jersey DEP and the DLGS, the agencies respectively responsible for enforcing the solid waste laws, *see* *N.J.S.A.* 13:1E–9(a), and administering the LPCL, *see* *N.J.S.A.* 40A:11–37, 40A:11–49, 52:27BB–6, 8, filed an *amicus curiae* brief concerning the interpretation of the bidding-requirement exception contained in *N.J.S.A.* 40A:11–5(1)(s).

The Appellate Division affirmed the trial court's holding that plaintiff Grywalski had satisfied the standing requirement. 291 *N.J.Super.* at 287, 677 *A.2d* 268. However, the Appellate Division reversed the trial court on the bidding issue, holding that the contract fell within the statutory exception to the LPCL relating to the marketing of recyclable materials. *Ibid.*

The Appellate Division construed the bidding exception statute on the basis of its plain meaning. *Id.* at 291, 677 *A.2d* 268. Applying a dictionary definition of "marketing," the panel concluded that the contract, which encompasses functions from curbside collection of recyclables through the sale of the recycled goods to a third party for reuse, is a "marketing" contract within the plain meaning of *N.J.S.A.* 40A:11–5(1)(s). *Id.* at 292, 677 *A.2d* 268.

The Appellate Division reasoned that a broad reading of the exception was appropriate because most of the exceptions in the

bidding statute are "designed to promote policy goals that the Legislature has found to be of sufficient independent importance to outweigh the salutary but constrictive effects of public bidding procedures." *Id.* at 291, 677 *A.*2d 268. The panel found support for its conclusion from the context in which the Legislature adopted *N.J.S.A.* 40A:11–5(1)(s), noting that the "provisions of subparagraph (s) and the definition of marketing that accompanied it into the LPCL were but part of a larger piece of legislation," the Recycling Act. *Id.* at 292, 677 *A.*2d 268. The court explained that the legislative history of the Recycling Act revealed that the Act's focus "was to mandate source separation of goods that could be recycled and 'returned to the economic mainstream in the form of raw materials or products[.]'" *Id.* at 293, 677 *A.*2d 268 (quoting *N.J.S.A.* 13:1E–99.11). The panel concluded that the exemption from bidding enacted in *N.J.S.A.* 40A:11–5(1)(s) "reflects a legislative assumption that in this new field the public entity charged with the responsibility of effecting the recycling program has greater leverage to achieve more favorable prices through negotiations than through bidding." *Ibid.* The court believed that MCIA's certification verified that assumption because it stated that the negotiation process had resulted in savings of approximately $5,500,000. *Ibid.* Additionally, the court relied on a certification by the former Director of the DSWM, which explained that with an integrated contract it was less likely that the recyclables would be contaminated by other solid waste, and that an integrated contract would assure the greatest retention of value for source-separated recyclables. *Ibid.*

The court rejected the trial court's narrow interpretation of subparagraph (s) because it determined that the policy considerations, such as prevention of corruption and excessive cost, that underlie the formal public bidding process were not implicated in the award of the contract to WMNJ. The court noted that the MCIA had used a competitive, negotiated process, with no evidence of favoritism, partiality or corruption. *Id.* at 294, 677 *A.*2d 268. Additionally, the panel found that no evidence existed that a bifurcated approach, which would require bidding for the collec-

tion component of the contract and negotiation for the marketing and sale components of the contract, would save the County money or further the legislative intent underlying the Recycling Act. *Ibid.*

Finally, the Appellate Division held that a joint advisory opinion letter issued by the DSWM and the DLGS that had concluded that *N.J.S.A.* 40A:11–5(1)(s) applied only to the sale of recyclable materials was not binding on the Appellate Division because the letter contained only "the conclusions of law of a state agency." *Ibid.*

National did not seek review of the Appellate Division's decision. On July 8, 1996, intervenors, represented by the Attorney General, moved for leave to intervene for the purpose of seeking certification. The Court granted intervenors' motion and subsequent petition for certification. Neither party appealed the standing issue.

## II

The LPCL requires public bidding for all municipal and county contracts exceeding $7500. *See N.J.S.A.* 40A:11–3, –4; *Meadowbrook Carting Co. v. Borough of Island Heights,* 138 *N.J.* 307, 313, 650 *A.*2d 748 (1994). The purpose of the public bidding requirement is to "secure for the public the benefits of unfettered competition[,]" and to "guard against favoritism, improvidence, extravagance, and corruption." *Terminal Constr. Corp. v. Atlantic County Sewerage Auth.,* 67 *N.J.* 403, 410, 341 *A.*2d 327 (1975); *see also N.E.R.I. Corp. v. New Jersey Highway Auth.,* 147 *N.J.* 223, 236, 686 *A.*2d 328 (1996) ("The practice of public bidding is universally recognized and deeply embedded in the public policy of this State."); *Utilimatic, Inc. v. Brick Township,* 267 *N.J.Super.* 139, 144, 630 *A.*2d 862 (Law Div.1993) ("The present statutory provisions are reflective of long established principles of common law. The purpose of the bidding laws is to protect the public by placing bidders on an equal footing and to ensure that competition will eliminate the possibility of fraud, extravagance or favoritism

in the expenditure of public funds."). *See generally* 10 McQuillin, *The Law of Municipal Corporations* § 29.29, at 375 (Gail A. O'Gradney & Charity R. Miller eds., 3rd ed.1990) (discussing purpose of public bidding).

■ Public bidding statutes exist for the benefit of taxpayers, not bidders, and should be construed with sole reference to the public good. *See N.E.R.I., supra,* 147 *N.J.* at 236, 686 *A.*2d 328; *Township of Hillside v. Sternin,* 25 *N.J.* 317, 322, 136 *A.*2d 265 (1957). Courts have accordingly curtailed the "discretion of local authorities by demanding strict compliance with public bidding guidelines." *L. Pucillo & Sons, Inc. v. Mayor of New Milford,* 73 *N.J.* 349, 356, 375 *A.*2d 602 (1977); *see, e.g., Meadowbrook Carting, supra,* 138 *N.J.* at 314, 650 *A.*2d 748; *Terminal Constr., supra,* 67 *N.J.* at 409–10, 341 *A.*2d 327; *Township of Hillside, supra,* 25 *N.J.* at 325–26, 136 *A.*2d 265; *426 Bloomfield Ave. Corp. v. City of Newark,* 262 *N.J.Super.* 384, 387, 621 *A.*2d 59 (App.Div. 1993); *see also Kurman v. City of Newark,* 124 *N.J.Super.* 89, 94, 304 *A.*2d 768 (App.Div.) ("Statutes calling for public bidding ... should be construed with sole reference to the public good and rigidly adhered to by the court."), *certif. denied,* 63 *N.J.* 563, 310 *A.*2d 477 (1973).

■ Municipal garbage collection contracts are subject to the LPCL public-bidding requirement. *See Meadowbrook Carting, supra,* 138 *N.J.* at 310, 650 *A.*2d 748; *In re Application of Saddle River,* 71 *N.J.* 14, 28, 362 *A.*2d 552 (1976). *See generally* New Jersey, State Commission of Investigation, *Solid Waste Regulation* 1–2 (April 1989) (1989 Commission Report) (documenting and evaluating need for solid waste reform in New Jersey during period of 1969 to 1989, and recommending continued encouragement of competitive processes in securing municipal solid waste contracts). Prior to the enactment of the Solid Waste Utility Control Act, *L.* 1970, *c.* 40 (codified at *N.J.S.A.* 48:13A–1 to –13), the Legislature received reports from several investigative bodies concerning the solid waste industry, indicating that the waste collection system "not only tended to inefficiency in the form of

wasteful fragmentation and conflicting licensing requirements, but also was fraught with the potential for abuse in the form of favoritism, rigged bids, official corruption, and the infiltration of organized crime." *In re Application of Saddle River, supra,* 71 *N.J.* at 22, 362 *A.*2d 552; *see* Frederick B. Lacey, U.S. Attorney for the District of New Jersey, *Recommendations to the 1970 Session of the New Jersey Legislature Concerning Legislation Which Might Be Enacted to Curb the Power and Influence of Organized Crime in New Jersey* 45–46 (Jan. 20, 1970); New Jersey, State Commission of Investigation, *Report Relating to the Garbage Industry of New Jersey* 2–7 (October 7, 1969). To remedy the systematic corruption, "while at the same time giving due attention to the public health and environmental aspects of the industry, most of the recommendations to the Legislature stressed the importance of encouraging competition within a regulated framework." *In re Application of Saddle River, supra,* 71 *N.J.* at 22, 362 *A.*2d 552. The legislative response reflected the Legislature's intent to ensure and encourage competition in the awarding of municipal solid waste contracts through the regulation of the solid waste industry as a public utility by the Board of Public Utilities (BPU), see *N.J.S.A.* 48:13A–1 to –13, in addition to public bidding. *In re Saddle River, supra,* 71 *N.J.* at 21–25, 362 *A.*2d 552.

In 1989, the State Commission of Investigation issued a second report, concluding that the regulation process had failed to encourage competition. 1989 Commission Report, *supra,* at 1, 33–50. The report recommended that the BPU regulation of haulers' rates be abolished and that the State should instead concentrate its efforts on encouraging competition through "eliminating unsavory elements from the industry." *Id.* at 2. It also recommended that an independent Solid Waste Authority be created to "subsum[e] the resources and remaining authority of the BPU and focus ... its attention on monitoring and stimulating competition among haulers." *Ibid.* Thereafter, the Legislature accepted those recommendations and enacted the Solid Waste Collection Regulatory Reform Act (Regulatory Reform Act), *L.* 1991, *c.* 381

(codified at *N.J.S.A.* 48:13A–7.1 to –.23), which provided for the eventual elimination of the rate regulation function of the BPU. The Regulatory Reform Act, however, continued supervision by the DSWM of the solid waste collection industry to ensure competition. *See, e.g., N.J.S.A.* 48:13A–7.19. The investigative reports from both 1969–70 and 1989 document the continued necessity for competitive bidding and for strict judicial construction of the LPCL as applied to solid waste collection.

In April 1987, the Legislature enacted the Recycling Act, *supra,* "the most comprehensive mandatory recycling program in the nation." Anthony T. Drollas, Jr., *The New Jersey Statewide Mandatory Source Separation and Recycling Act: The Nation's First Comprehensive Statewide Mandatory Recycling Program,* 12 *Seton Hall Legis.J.* 271, 272 (1989). The Act was part of a systematic attempt to improve the prior "crisis" situation caused by inadequate landfill space and resulted in the establishment of a system of waste management where "waste is disposed of efficiently and with a minimal negative impact on the environment." *Atlantic Coast Demolition & Recycling, Inc. v. Board of Chosen Freeholders,* 931 *F.Supp.* 341, 346 (D.N.J.1996), *rev'd on other grounds* 112 *F.*3d 652 (1997).

Concurrently with its passage of the Recycling Act, the Legislature amended the LPCL by adding, among other provisions, the exception set forth at *N.J.S.A.* 40A:11–5(1)(s). *See L.* 1987, *c.* 102, § 32. The Legislature also inserted the following definition of "marketing" in the LPCL's definition section:

(13) "Marketing" means the marketing of designated recyclable materials source separated in a municipality which entails a marketing cost less than the cost of transporting the recyclable materials to solid waste facilities and disposing of the materials as municipal solid waste at the facility utilized by the municipality.
[*L.* 1987, *c.* 102, § 30(13) (codified at *N.J.S.A.* 40A:11–2(13)).]

The question the Court must resolve is whether the exception in subparagraph (s) should be construed to apply to the curbside-collection component of a county's integrated recycling contract, or be limited to the post-collection sale of collected and sorted materials to an end-user.

■ The Legislature has enacted numerous other exceptions to the bidding statute, *see N.J.S.A.* 40A:11–5(1)(a) to -(bb), generally applying to situations in which public bidding would be "meaningless or impractical." *Capasso v. L. Pucillo & Sons*, 132 *N.J.Super.* 542, 550, 334 *A.2d* 370 (Ch. & Law Div.), *aff'd*, 132 *N.J.Super.* 473, 334 *A.2d* 334 (App.Div.1974). Courts have construed the LPCL exceptions strictly "so as not to dilute [the public policy] or permit a public body to avoid pertinent legislative enactments." *Autotote Ltd. v. New Jersey Sports & Exposition Auth.*, 85 *N.J.* 363, 370, 427 *A.2d* 55 (1981). Nevertheless, "the exceptions should [not] be read out of the statute," thereby frustrating the intent of the Legislature in its grant of power to the contracting authority. *See id.* at 376, 427 *A.2d* 55 (Pashman, J., concurring).

■ When construing a statute, courts initially consider the statute's plain meaning. *State v. Szemple*, 135 *N.J.* 406, 421, 640 *A.2d* 817 (1994); *Merin v. Maglaki*, 126 *N.J.* 430, 434, 599 *A.2d* 1256 (1992). However, the meaning of a statute is not self-evident where varying interpretations are plausible. *Szemple, supra*, 135 *N.J.* at 421–22, 640 *A.2d* 817. In this case, the trial court narrowly construed the term "marketing" in the subparagraph (s) exception, noting that the statute explicitly distinguished between recovery and recycling, and found that the exception did not apply to the curbside-collection aspect of a recycling contract. However, the Appellate Division, relying on a dictionary definition of the term "marketing," construed the text of the exception broadly to encompass the entire recycling process, including collection. Those differing interpretations suggest that the statutory meaning of the term "marketing" may not be obvious or self-evident. *See ibid.*

■ "When a statute is ambiguous, the Court must construe the statute in a way that will best effectuate the Legislature's intent." *Id.* at 422, 640 *A.2d* 817; *see Cedar Cove, Inc. v. Stanzione*, 122 *N.J.* 202, 213, 584 *A.2d* 784 (1991). The general intent of the statute controls the interpretation of its component parts. *Szemple, supra*, 135 *N.J.* at 422, 640 *A.2d* 817. *N.J.S.A.*

13:1E–99.11 states the Legislature's "findings and declarations" concerning the Recycling Act and broadly describes its goals:

> The Legislature ... declares that it is in the public interest to mandate the source separation of marketable waste materials on a Statewide basis so that reusable materials may be returned to the economic mainstream in the form of raw materials or products rather than be disposed of at the State's overburdened landfills, and further declares that the recycling of marketable materials by every municipality in this State, and the development of public and private sector recycling activities on an orderly and incremental basis, will further demonstrate the State's long-term commitment to an effective and coherent solid waste management strategy.

The lower courts attempted to effectuate the Legislature's expressed goals in their respective construction of the bidding exception for the marketing of recyclable materials. The trial court considered of paramount importance the long-standing policy requiring public bidding. The Appellate Division, on the other hand, emphasized the overall goal of the Recycling Act. Because it determined that an integrated contract was more practical in view of the potential long-term risk of a negative or non-existing market for recovered recyclable materials, the Appellate Division concluded that its interpretation better effectuated the legislative intent.

Given the contradictory interpretations of the lower courts, we resort to other sources to inform our conclusion, such as legislative history, legal commentary, agency interpretation and prior precedent, if available. Extrinsic aids may be used to interpret language beyond that expressly written in the statute. *See Szemple, supra,* 135 *N.J.* at 422, 640 *A.*2d 817; *Cedar Cove, supra,* 122 *N.J.* at 211, 584 *A.*2d 784. "Courts may ... freely refer to legislative history and contemporaneous construction for whatever aid they may furnish in ascertaining the true intent of the legislation." *New Jersey Pharmaceutical Ass'n v. Furman,* 33 *N.J.* 121, 130, 162 *A.*2d 839 (1960).

The legislative history does not explicitly indicate the Legislature's intended meaning concerning the term "marketing" contained in subparagraph (s). When originally proposed in 1986, the sponsors of the proposed legislation included as part of the

Recycling Act a public-bidding exception only for the "sale of recyclable materials," in the form of an amendment to *N.J.S.A.* 40A:11–36, the LPCL section requiring public sales to the highest bidder for the sale of a local contracting unit's personal property. *See* Senate Bill No. 1478, § 35 (1986) and Assembly Bill No. 1781, § 32 (1986). The congruent sections in those bills provided:

> b. Any contracting unit may, by resolution of its governing body, authorize the sale or disposition of recyclable materials recovered through a recycling program undertaken by the contracting unit. The sale of these recyclable materials, by contract or agreement, may be entered into or negotiated without public bidding by that contracting unit.

Intervenors observe that that proposed amendment suggests that the Legislature was concerned with the final disposition of recovered recyclables, not the initial collection phase.

Shortly before the final passage of Senate Committee Substitute Senate Bill No. 1478 in April 1987, the Senate Revenue, Finance and Appropriations Committee removed the sale of personal property amendment from the bill, substituting for it the definition of marketing contained in *N.J.S.A.* 40A:11–2(13), and adding the exception for marketing of recycled goods to *N.J.S.A.* 40A:11–5(1)(s), which initially provided: "The marketing of recyclable materials recovered through a recycling program." *L.* 1987, *c.* 102, § 32. The Senate Committee Statement accompanying the amendments stated that its purpose in amending that section was to "[c]larify the definitions and provisions of the local contracts law regarding contracts for recyclable materials." Senate Revenue, Finance and Appropriations Committee, *Statement to Assembly Committee Substitute for Senate No. 1478 and Assembly No. 1781,* at 2 (Feb. 5, 1987).

The Legislature has considered the subparagraph (s) exception several times since its original enactment. In 1989, the Legislature expanded the exception to include the language contained in the current version:

> (s) The marketing of recyclable materials recovered through a recycling program, *or the marketing of any product intentionally produced or derived from solid waste received at a resource recovery facility or recovered through a resource*

*recovery program, including, but not limited to, refuse-derived fuel, compost materials, methane gas, and other similar products.*
[*L.* 1989, *c.* 92 (emphasis added).]

The statements accompanying the assembly bill that was eventually enacted in chapter 92 do not clarify the Legislature's intent regarding the scope of the exception in subparagraph (s). *See* Senate Energy and Environment Committee, *Statement to Assembly Committee Substitute for Assembly Bill No. 464,* at 1 (Apr. 27, 1989); Assembly Solid Waste Management Committee, *Statement to Assembly Committee Substitute for Assembly Bill No. 464,* at 1 (Sept. 16, 1988).

In May 1992, a bill amending the definition of marketing in the LPCL to a definition virtually identical to the one contained in the Recycling Act was introduced in the Senate. *See* Senate Bill No. 834, § 1. Subsequently, that amendment was removed from the enacted bill. *See L.* 1992, *c.* 98. Neither the Assembly nor the Senate committee statements explain why that amendment was ultimately deleted. The bill, which was enacted into law, included an amendment to the LPCL allowing local contracting units to enter into contracts for the collection and disposition of recyclable materials for periods of up to five years, and added the term "disposition" to the definitional section of the LPCL. *L.* 1992, *c.* 98, § 1. "Disposition" was defined as "the transportation, placement, reuse, sale, donation, transfer or temporary storage of recyclable materials for all possible uses except for disposal as municipal solid waste." *Ibid.*

Finally, the Recycling Act was recently amended, authorizing any county, municipality, or authority to enter into a written cooperative agreement for the cooperative marketing of the recyclable materials designated in a district recycling plan. *L.* 1995, *c.* 103. The amendment added to the LPCL's definitional section a definition of "cooperative marketing," defined as the "joint marketing ... of the source separated recyclable materials designated in a district recycling plan." *N.J.S.A.* 40A:11–2(18). Assembly and Senate committee statements concerning the enacted bill stated that " '[c]ooperative marketing' refers to the joint sale

or competitive disposition of the source separated recyclable materials. . . ." Senate Natural Resources, Trade and Economic Development Committee, *Statement to Assembly Committee Substitute for Assembly No. 571,* at 1 (Dec. 1, 1994); Assembly Solid and Hazardous Waste Committee, *Statement to Assembly Committee Substitute for Assembly No. 571,* at 1 (June 9, 1994). As part of that amending bill, the cooperative marketing of recyclables was added to *N.J.S.A.* 40A:11–5(1) as an exception from the public-bidding requirement. *L.* 1995, *c.* 103, § 4 (codified at *N.J.S.A.* 40A:11–5(1)(aa)). The legislative history thus reveals that although the Legislature has considered the subparagraph (s) exception several times, it has not undertaken to amend or clarify its definition of the term marketing of recyclable materials beyond the expansion of the exception in 1989, which delineated specific end-products of recycling and resource recovery.

Contemporary legal commentary reflects the general understanding that recovery and recycling are separate and distinct concepts. "Recovery is the process whereby recyclable materials are removed from the solid waste stream. In contrast, recycling is the actual process by which recovered materials are incorporated into new products." Nicolas M. Küblicki, *The Paper Triangle: National Forest Timber, Solid Waste Disposal and Recycling,* 7 *Tul. Envtl. L.J.* 1, 28 (1993); *see also* James T. O'Reilly, *Recycling and Municipal Liability: Environmental Benefits and U.C.C. Risks,* 23 *Urb. Law.* 97, 99 (1991) ("Recycling is a term of art in the solid waste industry. It refers to the total process of diverting a collected solid waste, separating it into usable materials, and processing those materials into a new finished product. No recycling occurs from mere collection alone."). The application of those concepts to the statute suggests that "marketing of recyclable materials recovered through a recycling program" is *not intended to refer to the recovery stage,* which is the collection component of a recycling program.

 Governmental agencies charged with the enforcement of legislation can provide additional guidance in the interpretation of

a statute. Statutory interpretations by the administrative agencies who have been charged by the Legislature with a statute's enforcement are entitled to deferential consideration. *See Merin, supra,* 126 *N.J.* at 436–37, 599 *A.2d* 1256; *Service Armament Co. v. Hyland,* 70 *N.J.* 550, 561, 362 *A.2d* 13 (1976); *McCay Corp. v. Mt. Laurel Township Council,* 203 *N.J.Super.* 550, 559, 497 *A.2d* 570 (L.Div.1984). Since the 1987 adoption of the subparagraph (s) exception, the controlling interpretation provided by those agencies responsible for the implementation, enforcement and regulation of the LPCL, *see N.J.S.A.* 52:27BB–6, *N.J.S.A.* 52:18A–46; *N.J.S.A.* 40A:11–37, and the Recycling Act, *see N.J.S.A.* 13:1E–9(a), has been that public bidding is required for the collection phase of a recycling contract. In April 1988, the DLGS, together with the Division of Solid Waste Management (DSWM), issued a joint advisory opinion letter that addressed the question whether *N.J.S.A.* 40A:11–5(1)(s) applied to contracts combining the collection of recyclables with the final sale of the recovered recyclable goods. The letter stated:

> Please be advised that both State agencies believe that the [LPCL]'s competitive bidding exemption enacted along with the [Recycling Act] is *not* all inclusive. In our view the new exemption, *N.J.S.A.* 40A:11–5[ (1) ](s), is limited to the marketing of recyclables. Simply stated we believe the exemption only applies to the sale of recyclable materials.
>
> . . . .
>
> The exemption does not apply to contracts for recycling processes, consultants, *collection* or supplies and equipment. Furthermore, *public bidding may not be circumvented by combining a nonexempt item within an exempt marketing contract.* Such combination contracts continue to be subject to applicable bidding requirements *i.e.* competitive bidding, informal quotes, extraordinary unspecifiable services . . . and professional services.
>
> [Letter from Mary T. Shiel, Deputy Director, Division of Solid Waste Management, and Barry Skokowski, Sr., Director, Division of Local Government Services, to Public Officials 1–2 (Apr.1988) (emphasis added) (Joint Advisory Opinion Letter).]

Where agency interpretation coincides with the original enactment of a regulatory statute that the agency is charged with enforcing, the case for deference to the agency is strong. *See, e.g., Newark Firemen's Mut. Benevolent Ass'n v. Newark,* 90 *N.J.* 44, 55, 447 *A.2d* 130 (1982); *New Jersey Guild of Hearing Aid*

*Dispensers v. Long,* 75 *N.J.* 544, 575, 384 *A.2d* 795 (1978); *Waste Management of Central Jersey, Inc. v. DEPE,* 278 *N.J.Super.* 56, 64, 650 *A.2d* 379 (App.Div.1994); *In re Freshwater Wetlands Protection Act Rules,* 238 *N.J.Super.* 516, 527, 570 *A.2d* 435 (App.Div.1989). The agencies issued the joint letter within a year of the bidding exemption's enactment, responding to a "great deal of confusion [which] exist[ed] regarding contracting for various recycling services," Joint Advisory Opinion Letter, *supra,* at 1, and that statutory interpretation was not challenged until the present litigation was initiated, six years following the letter's issuance. Additionally, the DEP administrator who signed the 1988 joint advisory opinion letter played an active role in the legislative process itself. Mary T. Shiel, then Deputy Director of the DSWM, attended the four public hearings held by the Senate Energy and Environment Committee in 1985 and 1986. Shiel testified before the committee and was described by the committee chairman as a source to whom questions concerning the legislation could be addressed. *See* Establishment of Mandatory Statewide Recycling Program: Hearings on S–1478 Before the Senate Energy and Environment Committee (Apr. 15, 1986) 1–3, 8–14 and (February 13, 1986) 6–15. Federal precedent suggests that where an agency has been actively involved in the legislative process, the case for agency deference increases in weight. *See, e.g., Frank Diehl Farms v. Secretary of Labor,* 696 *F.*2d 1325, 1329–30 (11th Cir.1983); *see also Norwegian Nitrogen Prods. Co. v. United States,* 288 *U.S.* 294, 315, 53 *S.Ct.* 350, 358, 77 *L.Ed.* 796, 807 (1933) ("The practice has particular weight when it involves a contemporary construction of a statute by the men charged with setting its machinery in motion, of making its parts work efficiently and smoothly while they are yet untried and new."). Finally, we note that the interpretation provided by the agencies effectuates both the public policy of the LPCL and the Recycling Act by supporting a competitive process for the collection of recyclables, and allowing negotiated contracts for the disposition of recycled products. An agency's interpretation will prevail unless it is "plainly unreasonable," *see Merin, supra,* 126 *N.J.* at 436, 599

*A.*2d 1256, or fails to further the legislative purpose of the statute that it is interpreting, *see GE Solid State, Inc. v. Director, Div. of Taxation,* 132 *N.J.* 298, 306–07, 625 *A.*2d 468 (1993).

### III

We conclude that had the Legislature intended to exempt the curbside collection of solid waste for eventual recycling from the public-bidding requirement of the LPCL, it would have explicitly done so. To interpret consistently the related definitional sections of the LPCL and the Recycling Act is appropriate because they were enacted as part of the same legislation. The definition of "marketing" in the LPCL is virtually identical to that included in the Recycling Act, the only difference being that the Recycling Act refers to disposition and the LPCL refers to marketing. Both definitions appear to apply only to the post-collection aspect of a recycling contract, suggesting that the public-bidding exemption contained in the LPCL should be construed as referring only to those aspects of a recycling contract necessarily relating to the sale of recovered recyclable materials.

The legislative history supports that conclusion. Since 1989, the Legislature has considered *N.J.S.A.* 40A:11–5(1) and changes concerning definitions applicable to recycling exceptions, declining on several occasions to change the definition section. Additionally, during the same time period, when enacting solid waste legislation the Legislature reiterated its longstanding concern about competition in the solid waste collection industry, emphasizing the continuing need for supervision of the industry because of the impact of anti-competitive forces. *See N.J.S.A.* 48:13A–7.2.

Contrary to the Appellate Division's conclusion, we find that the joint advisory opinion letter is entitled to substantial deference. The administrative agencies charged with the enforcement of the Recycling Act and the LPCL agreed that competitive bidding was required for the collection of goods that would eventually be recycled and marketed. That interpretation of the statute effectuates the Legislature's intent in exempting from

public bidding the marketing of recycled recovered materials, which implicated an unknown market that might benefit from a more flexible negotiating process, in contrast to the traditional collection phase, which required continued supervision to ensure a healthy competitive process. Given the overwhelming public policy favoring competitive bidding in the garbage collection industry, we conclude that the subparagraph (s) exception from the LPCL does not apply to the curbside collection of recyclable materials. If we have misread the legislative intent, the Legislature may amend the statute to explicitly provide such an exemption.

In view of our determination that the procurement process engaged in by the County violated the LPCL, the Court must consider the disposition of MCIA's five-year contract, which has effectively two-and-a-half years until its completion. We acknowledge, as did the Appellate Division, that the County engaged in a competitive negotiation process resulting in a substantial savings to the County. As noted, the difference in price between the two final proposals was approximately $260,000. We are impressed that the negotiation process was constructively and fairly conducted.

We recognize that it may be inequitable to require rebidding of the contract because of the relationship among the collection phase of the contract, WMNJ's correlative obligations to market the recyclables and guarantee the County a base price for all recyclable material, and the fluctuation in the market value of recyclables. Because the MCIA engaged in extended negotiations for the County, we find the inference unavoidable that the price negotiated for the collection phase was influenced by the guaranteed price to be paid to the County as well as the uncertainty of the compensation to be realized by WMNJ from the recycling phase, and the five-year contract term that afforded WMNJ some protection against short-term market volatility. Although ordinarily we would order the collection phase of the contract to be rebid, see *Meadowbrook Carting, supra,* 138 *N.J.* at 325–26, 650 *A.*2d 748; *Terminal Constr. Corp., supra,* 67 *N.J.* at 410, 341 *A.*2d

327, we recognize that in this unique instance that remedy would be unfair to WMNJ who relied in good faith on MCIA's determination that bidding was not required, and may be prejudicial to County taxpayers who probably would be required to bear an increased cost because of the prospect that the re-bidding process would divide the responsibility for collection and disposal of recyclables between two contractors.

Accordingly, the contract may remain in effect until its termination date. Any subsequent contracts for the collection of recyclables must be procured in compliance with the LPCL bidding requirement.

## IV

We reverse the judgment of the Appellate Division that exempted from public bidding the collection phase of the contract. We remand the matter to the Law Division for entry of a judgment consistent with this opinion.

*For reversal and remandment*—Chief Justice PORITZ and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN and COLEMAN—7.