STATE OF NEW JERSEY, DEPARTMENT OF ENVIRON-
MENTAL PROTECTION, PLAINTIFF-RESPONDENT, v.
JERSEY CENTRAL POWER & LIGHT COMPANY, A NEW
JERSEY CORPORATION, DEFENDANT-APPELLANT.

Argued October 6, 1975—Decided January 22, 1976.

*Mr. Robert O. Brokaw* argued the cause for defendant-appellant.

*Mr. Lewis Goldshore,* Deputy Attorney General, argued the cause for plaintiff-respondent (*Mr. Robert J. Del Tufo,* Acting Attorney General of New Jersey, attorney; *Mr. Stephen Skillman,* Assistant Attorney General, of counsel; *Mr. Goldshore* on the brief).

The opinion of the Court was delivered by

SCHREIBER, J.   The Department of Environment Protection (DEP) initiated this action for penalties and damages against Jersey Central Power & Light Company (Jersey Central), a public utility engaged in the generation and distribution of electricity within the State, because of the deaths of a large number of menhaden fish. The deaths were allegedly caused by the sudden flow of cold water into a stream in connection with Jersey Central's operation of a nuclear power plant.

The complaint charged violations of *N. J. S. A.* 23:5–28, which prohibits the introduction of any hazardous, deleterious or destructive substances of any kind into any fresh or tidal waters, and *N. J. S. A.* 58:10–23.6, which requires that DEP be notified immediately after the discharge of hazardous substances into the waters of this State. Compensatory damages were sought for injury to public resources — the destroyed fish. The trial court dismissed the count which charged a violation of *N. J. S. A.* 58:10–23.6, concluded that Jersey Central had violated *N. J. S. A.* 23:5–28 for which it imposed a penalty of $6,000, and awarded the State $935 as compensatory damages. 125 *N. J. Super.* 97 (Law Div. 1973). Jersey Central appealed, and the State, complaining of inadequacy of the penalty and damages, cross appealed. The Appellate Division affirmed, 133 *N. J. Super.*

375 (1975), and we granted the defendant's petition for certification, 68 *N. J.* 161 (1975).

Both the trial court and the Appellate Division concluded that the introduction of the cold water into the stream constituted a violation of *N. J. S. A.* 23:5–28. They decided that the State was not limited to injunctive relief with respect to its cause of action which had been predicated upon damages to the public resources. As to this claim for damages, the trial court on defendant's motion for a new trial found "[t]here was no negligence proven," but held defendant was strictly liable because this was "an ultra-hazardous situation." The Appellate Division rejected this rationale because "the pumping of the cold water * * * cannot be considered an ultra-hazardous activity." It concluded that the defendant was negligent because it should have known that a "sharp reduction in water temperature would have damaged aquatic life." Jersey Central, having been licensed by the Atomic Energy Commission (AEC) because of its professed expertise "in this area", was to be held to the standards of "the reasonably prudent plant operator."[1] 133 *N. J. Super.* at 389.

Jersey Central's defense of federal preemption, namely, that Congress had vested the AEC with exclusive jurisdiction over the operation of the nuclear plant and disposal of radioactive wastes, was not discussed by the trial court. The Appellate Division rejected this defense as frivolous because the defendant "utterly failed to carry its burden of proof on the issue of [the] necessity" to operate the pumps to dilute atomic wastes. *Id.* at 391.

---

[1]The Energy Reorganization Act of 1974, Pub. L. 93–438, 88 *Stat.* 1233, which became effective January 19, 1975, abolished the Atomic Energy Commission and transferred its functions to two new agencies, Energy Research and Development Administration and the Nuclear Regulatory Commission. All licensing and related regulatory functions of the Atomic Energy Commission have been transferred to the Nuclear Regulatory Commission.

■ We find and conclude that the DEP has not established that the defendant's pumping of water from one stream into another constituted the introduction of a hazardous, deleterious or destructive substance into tidal waters in violation of *N. J. S. A.* 23:5-28, that defendant's pumping was not a cause in fact of the fish kill, and that Jersey Central's operation of the pumps was prescribed by the AEC to protect "against radiation hazards" and therefore was not subject to state regulation. *See* 42 *U. S. C. A.* § 2021(k).

On December 4, 1964 the AEC, after public hearings, issued a provisional construction permit to Jersey Central to build a boiling water nuclear fueled reactor at Oyster Creek in Lacey Township, Ocean County, New Jersey. It was contemplated that the plant's operation would alleviate some of the future energy requirements of its customers and those of its affiliated companies including New Jersey Power & Light Company.

In February 1965 the Board of Public Utility Commissioners, on its own motion, instituted proceedings with respect to the proposed construction and operation of the plant. *Re. Jersey Central Power & Light Co.,* 61 *PUR.* 3d 395 (1965). The Department of Conservation and Economic Development (subsequently designated as the Department of Environmental Protection, *N. J. S. A.* 13:1D-3, and hereinafter referred to as DEP) and the New Jersey Commission on Radiation Protection participated in those hearings.

A problem associated with the proposed plant concerned the necessity of cooling the condensers. Because of its location it was proposed that water be used for cooling. The plant site lies between Oyster Creek and the South Branch of Forked River, and between the Garden State Parkway and State Highway Route 9. The Creek and River extend from that location about a mile and a half eastward into Barnegat Bay. A canal was to be built to join Oyster Creek and the River. Water would be pumped from Forked River, run through the plant where it would be heated, and be discharged into Oyster Creek. The water would then flow from Oyster Creek into

Barnegat Bay. There was concern about the environmental impact of the heated water on fish life in Barnegat Bay.

The Board found that the record as a whole disclosed no significant radiation hazard associated with the proposal. It recognized that its authority may have been sharply limited due to federal preemption by the Atomic Energy Act, but in the absence of an adjudication to the contrary decided to act, since it was charged with the responsibility of enforcing the company's duty to render safe, adequate and proper service. *N. J. S. A.* 48:2–23. The Board noted that the parties had differences of opinion with respect to non-radiation hazards and directed the parties to confer among themselves.

As a result, an agreement was reached between Jersey Central and DEP under which the proposed cooling water canal system was to be constructed, contingent upon their making a joint study of the environmental effects on those areas of Barnegat Bay affected by the plant's discharge waters. The Board ordered that construction of the cooling water canal be deferred pending completion of the study. *Re Jersey Central Power & Light Co.*, 64 *PUR* 3d 152 (1966).

In its Third Interim Order, dater July 9, 1966, the Board approved construction of the water canal after the company and DEP had entered into a stipulation that "construction of the cooling water canals may be undertaken by the Company" upon certain conditions, none of which are relevant here. Thereafter the plant, including the cooling system, was constructed, and it has been operating under a license granted by the AEC.

Four circulating pumps force the water which has entered the canal from Forked River through the plant. This water is used to cool the steam in the condensers beneath the turbine generator. As planned, the water then flows into the discharge side of the canal and thence into Oyster Creek. There are three dilution pumps which propel other water directly through the canal without going into the plant. These are used mainly in the summer months to cool the water that comes from the circulating water pumps. When

the plant is in operation the temperature of the water in Oyster Creek at the canal is increased about 20°F.

Menhaden, which are caught in large quantities, are used for fertilizer, a protein supplement in livestock food, oil in paints, and bait. The fish are not comestible. In 1968 over 58,000,000 menhaden were caught in New Jersey, Delaware, Maryland, and parts of Long Island. In 1971 they were priced at less than 1-3/4 cents per pound. Generally, menhaden migrate to warmer waters in the winter because when the water temperature reaches 39°F they cannot survive, a fact dramatically portrayed by the events here.

On January 27, 1972 Jersey Central began to shut the plant down at 11:30 P.M. By 4:30 A.M. the next day the generator was inoperative. It did not come back on until January 31. One dilution and three circulating pumps continued to operate throughout this period and discharge 605,000 gallons per minute (g.p.m.) of unheated water into Oyster Creek. In about 12 hours after the shutdown, the temperature of the Oyster Creek water dropped from 60°F to 34°F. The air temperature, which affects water temperature, and the water temperature as recorded on the Forked River side of the plant were as follows:

| Date | Water Temperature Range | Air Temperature Range |
|---|---|---|
| January 27 | 35° - 37° | 15° - 28° |
| January 28 | 34° - 37° | 18° - 30° |
| January 29 | 36° - 37° | 10° - 32° |
| January 30 | 34° - 38° | 26° - 34° |
| January 31 | 34° - 37° | 15° - 29° |

The undisputed evidence was that the waters in Oyster Creek would have reached the same temperature as that in Forked River because of the tide change and the dissipation of the warmer water, even if the pumps were not operating.

It is readily apparent that the menhaden could not have survived in the water without the heat generated by the plant. It was not the precipitous drop in the temperature in Oyster Creek which caused the menhaden to die. It was the fact

that the temperature fell to 39°F and below. On other occasions when the plant had been shut down and the pumps operated, moving water from Forked River into Oyster Creek, no fish kills occurred even though there was a precipitous drop in the water temperature because the lower limit of that water temperature exceedeed 39°F. Other comparable occurrences demonstrate the point. The company records reveal the following:

| Date of Plant Shutdown | Pumps Operating after Shutdown | Temperature Drop in Water |
|---|---|---|
| Feb. 12, 1971 | 4 circulating | 56° - 44° |
| Nov. 16, 1971 | 3 circulating 1 dilution | 66° - 48° |
| Nov. 11, 1972 | 3 circulating | 76° - 55° |
| Dec. 29, 1972 | 4 circulating | 62° - 41° |

On none of these occasions were any menhaden injured. It is clear that what destroyed the fish was the cold temperature, a natural condition which existed in the environment independent of the operation of the plant.

No one has suggested that the defendant was obligated to operate its plant so as to heat the water in Oyster Creek and maintain a winter haven in the north for menhaden. If the plant had shut down and the pumps had not continued in operation, the defendant could not conceivably have been charged with placing a hazardous substance in Oyster Creek. Once it is recognized that the incident occurred because of the water temperature indigenous to the area and which would have existed in Oyster Creek even if the defendant's pumps had not been operating, then it follows that the essential causal link to place responsibility on the defendant is missing. Although pumping Forked River water into Oyster Creek may have accelerated the temperature drop, the State produced no competent evidence that the effect on the menhaden would have been any different in the absence of pumping. If the fish had moved to Barnegat Bay they would have encountered the same cold water which was in Forked River.

Cause in fact was an essential element in the State's case to establish a breach of the statute, *N. J. S. A.* 23:5–28, and compensatory damages for injury to the public domain or trust. *N. J. S. A.* 23:5–28 provides that:

No person shall put or place into, turn into, drain into, or place where it can run, flow, wash or be emptied into, or where it can find its way into any of the fresh or tidal waters within the jurisdiction of this State any petroleum products, debris, hazardous, deleterious, destructive or poisonous substances of any kind; * * *.

■ Water *per se* is not a hazardous, deleterious, destructive or poisonous substance when added to fresh or tidal waters. Nor would water which had a temperature of 34°F to 38°F fall into that category. It could only be so classified if it were injurious to fish. Under the circumstances here, cause in fact of damage to the menhaden had to be shown to establish a statutory violation.

■ If damage would have occurred in the absence of a party's negligence, then before responsibility may be imposed, the negligent conduct must be shown to have been a substantial factor in causing the harm. *Restatement, Torts* 2d § 432(1) at 430 (1965). Here the damage would have eventuated in the absence of the defendant's act or omission, which was not a substantial factor in the end result. Accordingly, cause in fact has not been demonstrated. Professor Beale in "The Proximate Consequences of an Act," 33 *Harv. L. Rev.* 632 (1920) wrote:

* * * if the result would have happened just as it did whether the alleged actor had done his duty or not the failure to perform the duty was not a factor in the result, or, in other words, did not cause it. [at 638].

To the same effect see *Harper & James, Law of Torts* § 20.2 at 1110, 1114 n. 18 (1956); *Prosser, Torts* § 41 at 238–239 (4th ed. 1971). Our courts have followed this principle. *Kulas v. Public Service Elec. and Gas Co.,* 41 *N. J.* 311 (1964); *Monaco v. Comfort Bus Line, Inc.,* 134 *N. J. L.* 553 (E. & A. 1946).

Since the defendant was only accelerating a condition which would have naturally occurred (which acceleration was not a substantial factor in causing the demise of the fish), it cannot be charged with polluting the creek in violation of *N. J. S. A.* 23:5–28 and cannot be responsible for compensatory damages for the death of the menhaden. The plaintiff has not met its burden of proof. *Dept. of Cons. and Econ. Dev. v. Scipio,* 88 *N. J. Super.* 315 (App. Div.), certif. den. 45 *N. J.* 598 (1965).

It might be argued that defendant caused the death of the fish by attracting them to the Creek through the warming of the water therein incident to operation of the plant; and then, having brought them there, killed them by discontinuing the plant operation, thus cooling the water. But this thesis cannot constitute a theory of culpable causation of the killing as it is undenied that the operation of the plant in the manner described was perfectly lawful (indeed, as discussed hereinafter, mandated by the requirements of the AEC). No one has suggested that there was any method by which the defendant could have prevented the fish from congregating in the waters of the Creek, or that there was a duty on the part of the defendant to prevent such congregation.

Furthermore, a finding of nonliability for Jersey Central is also dictated because of federal preemption. Application of *N. J. S. A.* 23:5–28 and the assertion of damages by the State either as *parens patriae* or public trustee are not permissible under the circumstances because of infringement upon and conflict with a subject matter over which Congress has vested exclusive jurisdiction in the AEC. The federal Atomic Energy Act governs the development, use and control of atomic energy. 42 *U. S. C. A.* § 2011 *et seq.* Federal control of the possession, use and production of atomic energy and special nuclear material is an avowed purpose of that act. 42 *U. S. C. A.* § 2013(c).

A nuclear plant cannot be operated without an AEC license. The AEC regulations, duly promulgated pursuant to authority vested in the Commission, *require* that the facility

function in accordance with the license terms, including all technical specifications set forth in or attached to the license. 10 *C. F. R.* §§ 50.36a, 50.54(n) (1975).[2] A license may be revoked for failure to "operate [the] facility in accordance with the terms of the * * * license or the technical specifications in the application * * *", 42 *U. S. C. A.* § 2236(a), and penalties may be imposed for such violations. 42 *U. S. C. A.* § 2282.

■ Provisions exist for cooperation and agreements between the states and the AEC, 42 *U. S. C. A.* § 2021(b), but, in the absence of any such agreement (New Jersey is not a party to an agreement), the area within which a state or local agency may act is restricted to the regulation of "activities for purposes other than protection against radiation hazards." 42 *U. S. C. A.* § 2021(k). A state may not interfere, directly or indirectly, with a preempted matter, even though the state's proscription may not have been directed at the particular activity involved. The Court in *Florida Avocado Growers v. Paul,* 373 *U. S.* 132, 83 *S. Ct.* 1210, 10 *L. Ed.* 2d 248, reh. den. 374 *U. S.* 858, 83 *S. Ct.* 1861, 10 *L. Ed.* 2d 1082 (1963) commented:

* * * The test of whether both federal and state regulations may operate, or the state regulation must give way, is whether both regulations can be enforced without impairing the federal superintendence of the field, not whether they are aimed at similar or different objectives. [373 *U. S.* at 142, 83 S. Ct. at 1217].

It has been held that in regulating the operation of a nuclear power plant, the federal government has, under the Atomic Energy Act, exclusively preempted that aspect which involves protection against radiation hazards. *Northern States Power Co. v. Minnesota,* 447 *F.* 2d 1143 (8 Cir. 1971), *aff'd mem.* 405 *U. S.* 1035, 92 *S. Ct.* 1307, 31 *L. Ed.* 2d

---

2§50.36a was promulgated on December 3, 1970. 35 *Fed. Reg.* 18388 (1970). § 50.54(n) was originally promulgated as § 50.54(j) on January 19, 1956 [21 *Fed. Reg.* 355 (1956)], and became § 50.54(n) on April 3, 1963 [28 *Fed. Reg.* 3197 (1963)].

576 (1972). Northern States Power Co. had constructed a nuclear-fueled electric generating plant near Monticello, Minnesota. The AEC had authorized construction of the plant and issued a provisional operating license to the company. Minnesota, through its Pollution Control Agency, sought to regulate radioactive waste releases to the environment. After a thorough review of the Atomic Energy Act, as amended, and its legislative history, the Circuit Court of Appeals concluded that "the states possess no authority to regulate radiation hazards unless pursuant to the execution of an agreement" between the AEC and the state. 447 *F.* 2d at 1149. It held that:

\* \* \* the federal government has exclusive authority under the doctrine of pre-emption to regulate the construction and operation of nuclear power plants, which necessarily includes regulation of the levels of radioactive effluents discharged from the plant [at 1154].

To the same effect see Interpretation by the AEC General Counsel, 10 *C. F. R.* § 8.4 (1975) ;[3] *Commonwealth Edison Co. v. Pollution Control Board,* 5 *Ill. App.* 3d 800, 284 *N. E.* 2d 342 (1972) ; and Reis, "Environmental Activities: Thermal Polution — AEC and State Jurisdictional Considerations," 13 *B. C. Ind. & Com. L. Rev.* 633, 661–663 (1972). In passing, it may be noted, as indicated above, that the Board of Public Utility Commissioners recognized probable preemption by the AEC's regulatory jurisdiction with respect to the discharge or monitoring of radioactive waste. *Re. Jersey Central Power & Light Company,* 61 *PUR* 3d 395, 399–400 (1965).

Jersey Central's license, which included certain technical specifications, required that reactor coolant leakage into the primary containment[4] from unidentified sources should not

---

[3]§8.4 was promulgated on May 3, 1969. 34 Fed. Reg. 7273 (1969).

[4]The primary containment is that part of the plant which houses the reactor among other things.

exceed 5 g.p.m., and the total leakage in the containment should not exceed 25 g.p.m. If either of these conditions occurred, the reactor had to be shut down. The license also provided that concentration of the radioactive liquid effluents released was not to exceed certain levels. See 10 *C. F. R.* §§ 20.106, 20.301, 20.302, 20 Appendix B, Table II, Col. 2 and nn. 1–5.[5] To avoid that concentration, the AEC technical specifications mandated a minimum dilution of 450,000 gallons of water per minute with the radionuclides which were being emitted.

It is undisputed that the plant had to shut down. Leakage from unidentified sources into the primary containment had been occurring and steadily increasing, and the maximum allowable amount was being reached. The uncontradicted testimony of both the company's Vice President in charge of generation and its Nuclear Engineer was to the effect that after the plant was closed it was essential that radioactive waste be released. It is true, as the Appellate Division pointed out, that continued operation of the pumps prevented corrosion of the condenser tubes and facilitated start-up of the generator. However, it is equally true that releases of the radioactive waste had to be made after the plant shut down. This requirement continued throughout the entire shutdown period, *viz.,* January 28 through January 31. In accordance with the AEC license and technical specifications, the radioactive waste had to be diluted with water — at least at a rate of 450,000 g.p.m. A fourth circulating pump which had a capacity of 115,000 g.p.m. was inoperative, so the company actuated a dilution pump with a capacity of 260,000 g.p.m. In this manner Jersey Central was able to dilute the radioactive waste with 605,000 g.p.m. — well over the minimum amount required.

---

[5] §20.106 was promulgated on October 21, 1964, 29 *Fed. Reg.* 14434 (1964). The relevant portions of §§ 20.301, 20.302 were promulgated on November 17, 1960. 25 *Fed. Reg.* 10914 (1960).

The contention that other possible methods of disposal of radioactive waste could have been authorized, such as trucking or construction of a pipeline into Barnegat Bay, is of no moment. Federal preemption is no less applicable. The AEC had authorized construction of this plant with its cooling water method, a method which had been approved by the New Jersey Board of Public Utility Commissioners and DEP. The company had received a federal license to operate in the manner in which it did. The AEC regulations prohibited it from operating in any other manner. 10 C. F. R. §§ 50.36a, 50.54(n) (1975). The cessation of the plant's functioning, emission of radioactive waste and dilution of that waste (obviously to protect against radiation hazards) were requirements included in the license. Interference by the State, whether by statutory penalty, injunction or monetary damages, with these facets of nuclear power generation, regulation of which has been vested exclusively with the AEC, is not permissible.[6]

In reaching our factual conclusions we have not been unmindful of our scope of review. State v. Johnson, 42 N. J. 146 (1964). In view of the fact that the trial court made no specific factual findings with respect to the need for disposal of radioactive waste, that the trial court found the defendant was not negligent, and that the Appellate Division overlooked crucial evidence to which we have alluded, we

---

[6]We are not holding that the state lacks authority to regulate all aspects of nuclear power plant operations. As we have pointed out, the federal legislation expressly permits certain state regulation. 42 U. S. C. A. § 2021(k). See for example Northern Calif. Ass'n, etc. v. Public Util. Com'n, 61 Cal. 2d 126, 37 Cal. Rptr. 432, 436, 390 P. 2d 200, 204 (Sup. Ct. 1964) where location of atomic reactors was held to be properly within the jurisdiction of the state. Estep & Adelman, "State Control of Radiation Hazards: An Intergovernmental Relations Problem," 60 Mich. L. Rev. 41, 60–61 (1961) contend that state and local regulations of electrical wiring, plumbing, sanitation, and other similar matters have not been preempted where those regulations do not conflict with or hamper compliance with federal regulation of radiation hazards.

have carefully reviewed the evidence and reached the conclusions stated herein.

The claim that the State, as *parens patriae* or as public trustee, had established a good cause of action for money damages must fall not only because of the failure to prove proximate cause, but also because of federal preemption. We do note, however, that the trial court found the defendant was not negligent and the Appellate Division assumed strict liability was not applicable because pumping cold water is not an ultrahazardous activity. Our review of the evidence satisfies us that there was sufficient credible evidence in the record to justify the trial court's finding that the defendant was not negligent. Whether in an action by the State as *parens patriae* or as public trustee strict liability should be applied, and whether the State is limited to injunctive relief, are questions the answers to which we leave for another day.

The judgment of the Appellate Division is reversed, and judgment is to be entered in favor of the defendant.

Justice Sullivan concurs in this result on the ground the plaintiff has not sustained its burden of proof with respect to proximate cause.

SULLIVAN, J., concurring in the result.

*For reversal*—Chief Justice HUGHES, Justices MOUNTAIN, SULLIVAN, PASHMAN, CLIFFORD and SCHREIBER and Judge CONFORD—7.

*For affirmance*—None.