708 A.2d 1161

NEW JERSEY DEPARTMENT OF ENVIRONMENTAL
PROTECTION, PLAINTIFF–APPELLANT, v. ALDEN
LEEDS, INC., DEFENDANT–RESPONDENT.

Argued November 18, 1997—Decided March 12, 1998.

274

*Ronald P. Heksch,* Deputy Attorney General, argued the cause for appellant *(Peter Verniero,* Attorney General of New Jersey, attorney; *Mary C. Jacobson,* of counsel; *Gene B. Rosenblum,* on the briefs).

*David L. Levinson,* a member of the New York bar, argued the cause for respondent *(Bruce L. Safro,* attorney).

The opinion of the Court was delivered by

COLEMAN, J.

This appeal raises two significant issues. The first is whether the Air Pollution Control Act of 1954 (APCA), *N.J.S.A.* 26:2C–1 to –25.2, and *N.J.A.C.* 7:27–5.2(a), one of its implementing regulations, impose strict liability for civil penalties on the owner or operator of a chemical facility that releases toxins into the atmosphere because of a fire of unknown origin on its premises. The second issue raised is whether the Department of Environmental Protection (DEP) was timely notified of the release as required by *N.J.S.A.* 26:2C–19e.

The Commissioner of the DEP concluded that the regulation imposes strict liability. He concluded that although a nexus between Alden Leeds and the release of pollution into the atmo-

sphere is required, the nexus can be established on the sole basis of knowing storage of highly reactive chemicals on the premises. The Commissioner of the DEP also found that the notice it received from the chemical operator was not timely. The Appellate Division found that merely storing chemicals on the premises does not satisfy the nexus requirement. The court found that the notice to the DEP was timely.

We hold that the APCA imposes strict liability and that knowingly storing chemicals that are highly reactive to heat and water satisfies the causal nexus. We also hold that the notice of the fire that was given to the DEP satisfied the APCA's requirements.

I

Alden Leeds stores, ships, and repackages swimming pool chemicals. Mark Epstein (Mark) is the president of Alden Leeds and his brother, Steven Epstein (Steven), is the vice president. The company has its principal place of business in Kearny. It processes dry chlorine into tablet form at a different site in South Kearny. The company packages those tablets for sale and distributes them in plastic containers labeled with silk screening equipment at the Kearny location. On any given day, twenty-one different chemicals that present a variety of hazards were stored at the Kearny facility. Alden Leeds listed both the chemicals stored and the individual hazards attendant to each in a Right-to-Know statement filed with the DEP.

On Saturday, April 10, 1993, a fire of unknown origin occurred at the Kearny facility while it was closed for the Easter holiday. There were no security guards or other personnel at the Kearny site that day. Jesus Urriola, an operations manager at Spectra–Serv located 300 feet north of the Alden Leeds Kearny site, saw smoke coming from Alden Leeds's property at approximately 11:30 a.m. He tried to call the fire and police departments for ten or fifteen minutes; the Kearny Fire Department arrived on the scene four or five minutes after the call. The burglar alarm system at Alden Leeds began sounding at 12:02 p.m., but there

was no response to that alarm. The Kearny Fire Department notified the DEP of the fire at 12:27 or 12:28 p.m. and reported that the fire had burned through the roof in a building containing "hazardous chemicals," causing the release of an "unknown gas."

At approximately 12:30 p.m., while Steven Epstein was driving to the Kearny facility, he saw smoke coming from the direction of Alden Leeds. A toll record shows that he exited the New Jersey Turnpike at exit 15E (a Kearny exit) at 12:37 p.m. When Steven arrived on the scene at approximately 12:39 p.m., he noticed that the gate to the property was open and there were firefighters present. He could not immediately tell whether the fire was at the Alden Leeds site or on neighboring property.

Steven eventually discovered that an Alden Leeds building, designated "Building One," was on fire. That structure housed offices, the art department, inventory, the liquid filling and silk screening operations, and employee locker rooms. Steven located and questioned the fire chief. Steven attempted to gain access to the building to determine exactly what was on fire so that he could advise the firefighters and call the DEP, but the fire chief refused and informed him that the DEP had already been called.

Approximately ten minutes later, the fire chief permitted Steven to enter the building. Steven informed the chief that the ceiling under which the firefighters were working was wooden and that the second floor housed heavy machinery. Steven then called the DEP to report the fire; he responded to all questions asked of him by the person answering the telephone. Alden Leeds's phone records show that Steven called the DEP at 12:57 p.m. and the DEP records indicate that the call was received at 12:58. It is unclear from the record whether the DEP operator asked Steven about the presence of hazardous chemicals. Steven recalls that the operator asked what was on fire and that he indicated polyethylene bottles and silk screening equipment. DEP records show that a fire was reported and that machinery and polyethylene bottles were threatened. The tape recording of this conversation was inaudible. Steven testified that it was not until at least one-

half hour after his call to the DEP that the fire reached the chlorine stored in the building.

DEP Emergency Response Specialist Bruce Doyle arrived on the scene shortly after 1:30 that afternoon. According to his analysis of the smoke from the fire, chlorine contaminants were being released into the atmosphere at a level of .5 parts per million. The DEP investigation of the fire revealed atmospheric chlorine levels between .1 and .3 parts per million in the western end of Hudson County. Doyle testified that different agencies establish an unacceptable level of chlorine in the atmosphere at between .5 and 1 part per million.

At the time the fire apparently started, Mark Epstein was shopping with his family in Nanuet, New York. At approximately 12:30 p.m., Mark's wife called her home from her car phone and was informed of the fire. Phone records show that at 12:44 Mark called the Kearny police from his wife's car phone. The police informed him that the DEP had been called and that Steven was on the scene.

The fire caused $9 million in damages to the Alden Leeds property and the release of chlorine gas and other by-products into the atmosphere. The DEP informed people downwind of the fire that they should remain indoors with their windows closed. The fire also necessitated the closing of the Turnpike, Route 1/9, the Lincoln Highway, the Pulaski Skyway, and Route 280. The DEP halted service on the PATH and Amtrak trains in that area. A number of people went to local hospitals complaining of respiratory problems.

## II

The DEP assessed two civil administrative penalties against Alden Leeds that are relevant to this appeal. First, the DEP found that Alden Leeds "did cause, suffer, allow or permit chlorine and calcium chloride resulting from a fire to be emitted into the outdoor atmosphere in quantities which resulted in air pollution, in violation of *N.J.A.C.* 7:27–5.2(a)." Second, the DEP found that

Alden Leeds "caused the release of an air contaminant(s) chlorine and calcium chloride resulting from a fire, in a quantity or concentration which posed a potential threat to public health, welfare or the environment or may have reasonably resulted in citizen complaints and failed to notify the Department immediately, in violation of *N.J.S.A.* 26:2C–19(e)."

The DEP assessed penalties for each offense in the amount of $6,500. It calculated the amounts by starting with $10,000, the base penalty for the offenses, and then applied percentage reductions for remedial measures taken (15%), population affected (5%), and off-site property damage (15%). Alden Leeds contested the penalties assessed, and the matter was referred to the Office of Administrative Law.

An Administrative Law Judge (ALJ) found that Alden Leeds was responsible for the release under the provisions of the APCA, determining that although an unknown third party caused the fire, the APCA is a strict liability statute. The ALJ also concluded that Alden Leeds failed to notify the DEP immediately because a call was not made to the DEP until one hour and eighteen minutes after the initial release and the call did not provide relevant information such as a list of potentially toxic chemicals threatened by the fire. Furthermore, the ALJ found that Alden Leeds was obligated to have reliable safety mechanisms in place that were commensurate with the hazardous inventories stored on the premises.

The Commissioner of the DEP adopted the ALJ's decision with regard to the release. The Commissioner concluded that although neither an intent to cause a release nor fault is a necessary requirement to impose liability under the APCA, "some causal nexus between Alden Leeds and the offending release must be established." The Commissioner found that the required causal nexus was established by the knowing storage of chemicals reactive to heat and water. The Commissioner also concluded that the reasonableness of Alden Leeds's notice to the DEP must be determined based on the time it took Alden Leeds to notify the

DEP after it had actual knowledge of the fire. The Commissioner determined that the delay in this case was unreasonable.

The Appellate Division reversed the Commissioner's decision in an unpublished opinion. Finding that the APCA imposed strict liability, the appellate panel concluded that the storage of chemicals was not a sufficient causal nexus. The panel also concluded that because Alden Leeds did not cause the release, immediate notification was not required. The court noted that even if a causal nexus was found, it was reasonable for Steven to gather information prior to calling the DEP. We granted the DEP's petition for certification, 149 *N.J.* 143, 693 *A.*2d 112 (1997), and now affirm in part and reverse in part.

III

-A-

As originally enacted, section 8 of the APCA authorized the Air Pollution Control Commission (Commission), established within the Department of Health (DOH), to "formulate and promulgate ... regulations controlling and prohibiting air pollution." *L.* 1954, *c.* 212, § 8. In 1967, the Commission was abolished and all its powers, including the power to promulgate regulations, were transferred to the DOH. *L.* 1967, *c.* 106, §§ 2, 6. In 1970, the Legislature transferred all functions, powers, and duties of the DOH relating to air pollution to the Division of Environmental Quality and the Commissioner of the DEP. *N.J.S.A.* 13:1D–7. Therefore, the fire in the present case falls within the jurisdiction of the DEP.

In 1960, the DOH and the Air Pollution Control Commission promulgated the New Jersey Air Pollution Control Code. The regulation provided: "No person shall cause, suffer, allow or permit to be emitted into the outdoor atmosphere substances in quantities which shall result in air pollution." New Jersey Air Pollution Control Code, Chapter VI, Section 2.1. That regulation

was subsequently readopted and codified at *N.J.A.C.* 7:27–5.2(a). It provides:

> Notwithstanding compliance with other subchapters of this chapter, no person shall cause, suffer, allow or permit to be emitted into the outdoor atmosphere substances in quantities which shall result in air pollution as defined herein.
>
> [*N.J.A.C.* 7:27–5.2(a).]

Alden Leeds was charged with violating that regulation.

Related to, yet independent of, the alleged code violation, Alden Leeds was charged with violating the specific notice provision of the APCA itself. That charge was based on *N.J.S.A.* 26:2C–19e. It provides:

> A person who causes a release of air contaminants in a quantity or concentration which poses a potential threat to public health, welfare or the environment or which might reasonably result in citizen complaints shall immediately notify the department. A person who fails to so notify the department is liable to the penalties and procedure prescribed in this section.
>
> [*N.J.S.A.* 26:2C–19e.]

-B-

The DEP argues that pursuant to its authority under the APCA to adopt regulations to combat air pollution, it promulgated a strict liability regulation prohibiting the release of harmful toxins into the air regardless of fault. It maintains that the Appellate Division's requirement that in order to sustain a violation of *N.J.A.C.* 7:27–5.2(a), the DEP must show that some conduct by a responsible owner or operator of a chemical facility caused the fire that precipitated a release of air pollution is not required by the APCA and its implementing regulations.

There has been little consideration of the APCA in either legislative history (it passed without a statement) or judicial decisions. As a preliminary matter, *N.J.S.A.* 26:2C–19e, under which Alden Leeds was punished, did not exist in the original enactment. However, an analysis of the original enactment and its subsequent modifications help to inform our decision.

The original statute imposed limitations on the expressed powers of the Commission. The statute provided for a two-tiered

structure. The Commission was responsible for promulgating regulations controlling air pollution, while enforcement and implementation responsibilities were left to the DOH. Gerard R. Moran, *The Air Pollution Control Act and Its Administration*, 9 *Rutgers L.Rev.* 640, 658 (1955). Therefore, the enforcement capabilities of the DOH were at the mercy of the rule-making power of the Commission. That structure ensured a period, after passage of the statute, in which the APCA had no enforcement aspect. *Ibid.*

The power of the DOH to "control air pollution" by requiring registration and exercising the ability to enter and investigate a suspected pollution site was severely limited. *L.* 1954, *c.* 212, § 9. Those powers were to be exercised only if the registrant or suspected polluter consented to the intrusion. *Ibid.* If the registrant refused consent, the Legislature required a hearing before the DOH could take any action. *Ibid.* That permitted polluters in operation at the time the statute went into effect to continue polluting because of the "absence of an authorization for agency resort to court for enforcement of its early orders." Moran, *supra*, 9 *Rutgers L.Rev.* at 660; *see also id.* at 661–62.

The original statute's primary enforcement provision was contained in section 19, where it remains today in an amended form. The original provision provided for civil liability in the form of a fine. The fine was to be imposed if the polluter had not taken the remedial actions before the expiration of the time period contained in a DOH order to take preventative or corrective measures.

The statute underwent significant changes during the 1962 legislative session which strengthened the DOH's powers and added provisions to section 19. *L.* 1962, *c.* 215. Specifically, the amendments removed the consent and hearing requirement regarding the registration and enter-and-search provisions of the statute. *L.* 1962, *c.* 215, § 3. Additionally, the Legislature amended section 19, increasing the amount of the penalty that could be imposed. *L.* 1962, *c.* 215, § 11. The amendments also modified section 14, the triggering section of the statute. Whereas in 1954, the DOH could undertake an investigation only after a written

complaint had been filed, the 1962 amendment authorized the DOH to investigate "[w]henever the department has cause to believe that any person is violating any code, rule or regulation promulgated by the commission...." *L.* 1962, *c.* 215, § 6. Finally, the Legislature permitted the DOH to order offending entities to cease their activity until remedial action was taken.

The scope of the 1962 amendments, as compared to the original enactment, reflects that the Legislature sought to strengthen the DOH's enforcement authority under the APCA. The amendments abridged the power of suspected polluters to control compliance or investigation by simply refusing consent.

Five years later, the APCA was again amended to better control pollution. In 1967, the Legislature not only authorized the DOH to continue with enforcement actions in the Superior Court, but also authorized the courts to grant injunctive relief in a "summary manner." *L.* 1967, *c.* 105, § 1. In addition, the Legislature enhanced the penalties and provided for continuing penalties for ongoing offenses. *L.* 1967, *c.* 105, § 1.

When the 1967 amendments became law, Governor Richard J. Hughes stated that the "signing of these control measures places this State in the forefront of the fight for clean air and water." *Statement by Governor Richard J. Hughes on Signing the Air and Water Pollution Bills,* Sen. Bill No. 180, June 15, 1967. He continued, "The perils of air and water pollution are so vast and so ominous that we must never relax in our efforts to assure to our citizens two basic God-given rights, which have too often been overlooked in our modern age—clean air and clean water." *Ibid.*

Finally, in 1985, the Legislature amended *N.J.S.A.* 26:2C–19 to include section "e" under which Alden Leeds has been charged. *L.* 1985, *c.* 12, § 1. The Legislature bifurcated *N.J.S.A.* 26:2C–19 into five subsections. Those sections incorporated the DOH's ability to institute a civil suit (subsection a), to impose an increased civil administrative penalty (subsection b), to settle a claim (subsection c), to fine an entity for violations of the original statute (subsection d), and to require notice of release of air contaminants

(subsection e). Subsection 19e has not been changed since it became effective in 1985. Those amendments strengthened New Jersey's ability to combat air pollution by increasing the penalties that the DEP was permitted to impose. Senate Energy and Environment Committee, *Statement to Senate Bill No. 2480,* (Dec. 6, 1984).

> The bill also requires the immediate notification of the department of any violations. The penalty for failure to notify the department would constitute a separate violation and subject the violator to liability to the increased penalties.
>
> [*Ibid.*]

Despite the limited legislative history, we must nonetheless decide whether a causal nexus between the release and the actions or inactions of Alden Leeds is required by either *N.J.S.A.* 26:2C–19e or *N.J.A.C.* 7:27–5.2(a). Both the DEP and the Appellate Division agree that the APCA is a strict liability statute. The DEP in its decision concluded that "neither intent to release the air pollutant, nor fault is a necessary element of the violation. Yet, some causal nexus between Alden Leeds and the offending release must be established." The Appellate Division agreed with that conclusion. The DEP found that the nexus was established based on Alden Leeds' knowingly storing at the Kearny site large quantities of chemicals that were highly reactive to heat and water. The Appellate Division disagreed with that conclusion. Because the petition for certification has not questioned whether or not the APCA is a strict liability statute, we will not extensively treat the issue. Rather, the primary focus will be whether storing the chemicals and the heating of them during the fire established the nexus.

We agree with the Appellate Division and the Commissioner of the DEP that the APCA and regulations promulgated pursuant to it impose strict liability. The legislative scheme of the APCA evinces a plan to curtail and combat pollution regardless of fault. Each legislative amendment since 1962 has manifested a clear intent to curtail air and water pollution quickly in order to protect the health of our citizens. Because the APCA has as its purpose "the protection of the public health and public welfare, [it]

is entitled to a liberal construction for the accomplishment of its obvious beneficent objective." *Department of Health v. Owens–Corning Fiberglas Corp.*, 100 *N.J.Super.* 366, 382, 242 *A.*2d 21 (App.Div.1968), *aff'd o.b.*, 53 *N.J.* 248, 250 *A.*2d 11 (1969). We are similarly persuaded that *N.J.A.C.* 7:27–5.2(a) imposes strict liability for the release of air pollution. The DEP's interpretation of a regulation it is required to enforce is entitled substantial weight. *National Waste Recycling, Inc. v. Middlesex County Improvement Auth. & Waste of N. Jersey, Inc.*, 150 *N.J.* 209, 228, 695 *A.*2d 1381 (1997); *Merin v. Maglaki*, 126 *N.J.* 430, 436–37, 599 *A.*2d 1256 (1992); *Tufaro v. Department of Human Servs.*, 90 *N.J.* 538, 547, 449 *A.*2d 1 (1982).

## IV

We turn now to whether a causal nexus between the fire and the release of pollution was established. In concluding that it was not, the Appellate Division relied on *Department of Health v. Roselle*, 34 *N.J.* 331, 169 *A.*2d 153 (1961). That reliance was misplaced.

In *Roselle*, the defendants, refuse dump operators, had consented to a judgment obtained by the DOH ordering the defendants to cease violating the Air Pollution Control Code which prohibited the open burning of refuse. *Id.* at 335–36, 169 *A.*2d 153. The DOH brought an action against the defendants for failing to comply with the prior judgment when fires of unknown origin continued. *Ibid.*

The provision at issue was adopted after the Air Pollution Commission had intentionally permitted the continuance of open dumping despite its awareness that fire outbreaks were likely to continue absent deliberateness due to the dumping of hot ashes and spontaneous combustion. *Id.* at 349, 169 *A.*2d 153. The Code provided that no person " 'shall cause, suffer, allow or permit open burning of refuse.' " *Ibid.* (quoting the Air Pollution Control Code). The Court concluded that "[t]he word 'cause' is clear enough, and if defendants had set the fires in question, their violation of the injunction would be plain, and the vagueness of the

words 'suffer, allow or permit' would not relieve them of responsibility." *Id.* at 349–50, 169 *A.*2d 153.

*Roselle* is distinguishable from the present case for a number of reasons. Based on the Commission's decision to continue to permit open dumping with the knowledge that fires were inevitable, the *Roselle* Court found that the regulation was specifically aimed at eliminating intentional fires, rather than spontaneous fires. *Ibid.* The Court's conclusion that "cause" required more than a fire of unknown origin was reached based on the special facts that at least two known potential causes of fires were unrelated to defendant's conduct. Here, *N.J.A.C.* 7:27–5.2(a) is a blanket prohibition on the release of contaminants into the atmosphere, regardless of any unintentional or unexplained intervening causes that may have started the fire.

■ The two cases can be further distinguished. The event prohibited by the provision in *Roselle* was the fire. The defendant in that case did not cause the fire. Here, the prohibited event was the "emi[ssion] into the outdoor atmosphere [of] substances in quantities which shall result in air pollution." *N.J.A.C.* 7:27–5.2(a). We are satisfied that the act of housing dangerous substances is enough to impose liability for causing a release of air pollution if those substances are somehow released. That analysis could not apply to *Roselle* because the punished act was not the emission but was the actual fire.

Finally, *Roselle* was decided in 1961. Since that time, the Legislature has strengthened the ability of the State's regulatory agencies to limit, control, and punish those responsible for air pollution. Indeed, only eight years after *Roselle,* the Appellate Division noted that from the 1967 amendments to the APCA, "[o]ne must draw the conclusion that the Legislature, faced by the increasingly serious and indeed emergent problem of air pollution, was not satisfied with the progress made by the [Air Pollution Control] Commission." *Consolidation Coal Co. v. Kandle,* 105 *N.J.Super.* 104, 125, 251 *A.*2d 295 (App.Div.), *aff'd o.b.,* 54 *N.J.* 11, 252 *A.*2d 403 (1969).

As we noted previously, the APCA has undergone significant changes since its original enactment. *See, e.g., L.* 1995, *c.* 188; *L.* 1994, *c.* 101; *L.* 1993, *c.* 257; *L.* 1989, *c.* 333; *L.* 1985, *c.* 12; *L.* 1971, *c.* 155; *L.* 1967, *c.* 106; *L.* 1962, *c.* 215. The overall nature of those changes reflects the Legislature's goal to strengthen the ability of the agencies to control and prevent air pollution. Additionally, since *Roselle* was decided in 1961, our common law has evolved to recognize the principles we articulate in this case. In 1962, this Court adopted the proposition that "an ultrahazardous activity which introduces an unusual danger into the community [ ] should pay its own way in the event it actually causes damage to others." *Berg v. Reaction Motors Div., Thiokol Chem. Corp.,* 37 *N.J.* 396, 410, 181 *A.*2d 487 (1962). In 1983, the Court expressly recognized "that the law of liability has evolved so that a landowner is strictly liable to others for harm caused by toxic wastes that are stored on his property and flow onto the property of others." *State v. Ventron Corp.,* 94 *N.J.* 473, 488, 468 *A.*2d 150 (1983). The Court explained "that those who use, or permit others to use, land for the conduct of abnormally dangerous activities are strictly liable for resultant damages." *Ibid.;* see also *Bahrle v. Exxon Corp.,* 145 *N.J.* 144, 156–57, 678 *A.*2d 225 (1996) (reaffirming the Court's holding in *Ventron, supra* ); *Restatement (Second) of the Law of Torts* §§ 519, 520 (1969) (setting out strict liability rule and test for abnormally dangerous activity on land). The same rationale applies to pollution that is released into the air from chemicals stored at a chemical facility.

An actor who chooses to store dangerous chemicals should be responsible for the release of those chemicals into the air. That Alden Leeds lawfully and properly stored chemicals does not alter that conclusion. *See DeEugenio & Sons v. Division of Envtl. Quality,* 92 *N.J.A.R.*2d (Vol.5) (EPE) 47, 1992 WL 257715, *aff'd,* No. A–4055–91T2, (App. Div. April 2, 1993), *certif. denied,* 134 *N.J.* 480, 634 *A.*2d 527 (1993) (holding that despite lawfulness of open burning in question, consequent deposit of smoke particulate on neighboring property violated *N.J.A.C.* 7:27–5.2(a)).

The risks attendant to the storage of dangerous substances counsel in favor of precautions to prevent their release. Alden Leeds took no such precautions. On the day of the fire, there was no one stationed at the plant to alert the authorities as soon as a fire or other unforeseen calamity erupted. Nor was there any other early warning system in place. A burglar or smoke alarm sounded, but there was no response to that alarm. The law imposes a duty upon those who store hazardous substances to ensure that the substances on their property do not escape in a manner harmful to the public. Alden Leeds failed to meet that burden.

Although Alden Leeds was not found responsible for the fire, the company's facility caused a release of air pollutants. The required nexus is satisfied by the knowing storage of hazardous chemicals. Regardless of what started the fire, it was the knowing storage of chemicals by Alden Leeds that caused the release of air contaminants once the fire reached the chemicals.

V

Next we address whether Alden Leeds gave timely notice to the DEP as required by *N.J.S.A.* 26:2C–19e. That statute required notice of the fire to have been given to the DEP "immediately." Alden Leeds admits that the statute required it to give timely notice of the fire to the DEP. It was charged with violating that statute and the DEP Commissioner concluded that the statute was violated because the notice was not given immediately.

Immediate notification is required "so that if the release involves either the risk of serious harm to the public health, or to the environment, or the risk of panic, those risks could be minimized" by the DEP. *New Jersey Dep't of Envtl. Protection & Energy v. Occidental Chem. Corp.*, 288 *N.J.Super.* 458, 463, 672 A.2d 1167 (App.Div.1995). Immediate notice is imperative "so that help can be dispatched, evacuation started, traffic patterns rerouted, and local police, fire, hospitals and ambulance squads and the local civil defense office notified." *Ibid.*

The meaning of "immediately" is at issue in the present case. The DEP has interpreted the term to require " 'a case-by-case determination as to whether notice was given as soon as reasonably possible under the circumstances.' " *Id.* at 464, 672 A.2d 1167. We agree.

For purposes of determining whether notification was immediate, the period before notification is measured from the time a chemical owner or operator has actual knowledge or reason to know of a fire that threatens toxic chemicals or the time of an actual release, whichever is sooner. *Mobil Chem. Co. v. Department of Envtl. Protection,* 13 *N.J.A.R.* 791, 802 (1988). Eighteen minutes elapsed between Steven's arrival at the facility and his call to the DEP. Before calling the DEP, Steven took reasonable actions to protect the firefighters before gathering information to call the DEP. There is no evidence of time wasted prior to notifying the DEP. It is reasonable to "gather information for the Department's required incident notification form before notifying the Department." *Occidental, supra,* 288 *N.J.Super.* at 464, 672 A.2d 1167. Although he found that Alden Leeds's notice was inadequate, the Commissioner noted that in order for the notification to be useful, basic information must first be gathered, including the location of the release, the nature of the released substance, the magnitude and time of the release, and whether the release is under control. Steven spent his first eighteen minutes at the scene trying to ascertain that information. First, he tried to gain access to the building because of the fire barricade that had been established. After he was allowed to enter, he made an inspection. He called the DEP as soon as he had completed his investigation.

It was entirely reasonable for Steven to gather information important to the safety of the firefighters on the scene. The Commissioner recognized that protecting human health from an imminent threat of harm may take precedence over the duty to notify the DEP immediately. Here, the firefighters were operating under a wooden second floor that held heavy machinery. That

information was critical to firefighters working under a weakened structure supporting heavy overhead equipment. We conclude that under the circumstances, the notice to the DEP was timely.

 We also reject the DEP's contention that the notice was not adequate. When Steven called, he informed the operator that there was a fire involving polyethylene bottles and silk screening equipment. At the time, that appears to have been the extent of his knowledge. He should have also informed the DEP of the possibility of the fire spreading to chlorine. The record does not reveal whether or not he so informed the DEP because the cassette of his phone call is inaudible and he does not recall his complete conversation. In the future, computerization of a chemical operator's Right–to–Know statement will allow the person receiving the notice to have instant access to the list of chemicals stored on the premises. We conclude that under the circumstances, the notice given by Steven was adequate.

## VI

We affirm that part of the Appellate Division's judgment holding that the APCA and *N.J.A.C.* 7:27–5.2(a) impose strict liability and that a causal nexus must exist between Alden Leeds and the release of hazardous chemical pollution into the atmosphere. We reverse that part of the judgment holding that the storing of hazardous chemicals by Alden Leeds may not satisfy the nexus. The DEP need not prove that the chemical operator started the fire. We also affirm the finding that the notice given satisfied the requirements of *N.J.S.A.* 26:2C–19e.

Affirmed in part and reversed in part.

GARIBALDI, J., dissenting in part, concurring in part.

The majority affirmed in part and reversed in part the Appellate Division. It reversed the Appellate Division and concluded that "knowingly storing chemicals that are highly reactive to heat and water satisfies the causal nexus" sufficient to impose civil

penalties against the owner or operator of a chemical facility that releases toxins into the atmosphere under *N.J.A.C.* 7:27–5.2(a). *Ante* at 275, 708 A.2d at 1162. Under that holding, the owner or operator of a chemical factory that lawfully and properly stores chemicals would be liable under *N.J.A.C.* 7:27–5.2(a) for the release of toxins as a result of a fire caused by an arsonist. I do not believe that when *N.J.A.C.* 7:27–5.2(a) was promulgated in 1969, the Legislature authorized the Department of Environmental Protection (DEP) to impose such liability. I, as did the Appellate Division, find that merely storing chemicals on the premises does not satisfy the causal nexus requirement of *N.J.A.C.* 7:27–5.2(a).

I do, however, agree with the majority when it affirmed the Appellate Division, and held that the notice the DEP received from the operator of the chemical company was timely under *N.J.S.A.* 26:2C–19(e).

I

The facts are undisputed. Alden Leeds manufactures and packages swimming pool chemicals for consumer use. On April 10, 1993, the plant was closed for the Easter holiday. A fire broke out of unknown origin, causing a release of chemicals into the air. The chemicals were legally and properly stored at the factory. The administrative law judge (ALJ) found that the fire was ignited by an unknown third party.[1] There is no allegation that the fire was caused by the negligence of Alden Leeds or any of its employees.

The DEP filed administrative charges against Alden Leeds for violations of *N.J.S.A.* 26:2C–19(e) and *N.J.A.C.* 7:27–5.2(a). A hearing was held before an ALJ who concluded that *"no mens rea"* was required to establish a violation of the statute and the regulation. Accordingly, the ALJ found that Alden Leeds violated both. Although the Commissioner of the DEP adopted the ALJ's

---

[1] There is a reference in the police log that an unnamed third party called the Kearny Police Department to claim responsibility for the fire.

decision with respect to liability, he concluded that "[c]ertainly neither intent to release the air pollutant, nor fault is a necessary element of the violation. Yet *some causal nexus* between Alden Leeds and the offending release must be established." (Emphasis added). The Commissioner found such a causal nexus merely from the legal and proper storage of the chemicals. I disagree.

I agree with the majority that *N.J.A.C.* 7:27–5.2(a) imposes strict liability. I also agree with the majority that a causal nexus must be established between Alden Leeds' activities and the release of contaminants into the atmosphere. However, from an examination of the plain language of the statute, relevant case law, and legislative history, I conclude that something more than the mere lawful storing of chemicals is required to establish a causal nexus under *N.J.A.C.* 7:27–5.2(a). Stated differently, the mere happening of a fire caused by an unknown third party is insufficient to impose liability.

### A.

*N.J.A.C.* 7:27–5.2(a) provides:

Notwithstanding compliance with other subchapters of this chapter, *no person shall cause, suffer, allow or permit* to be emitted into the outdoor atmosphere substances in quantities which [sic] shall result in air pollution as defined herein. [ (Emphasis added).]

Although the words "cause, suffer, allow or permit" are not defined in *N.J.S.A.* 26:26–19(e) or *N.J.A.C.* 7:27–5.2(a), the plain language of the regulation—"no person shall cause, suffer, allow or permit...."—indicates that some volitional act is required to impose liability. In *Department of Health v. Roselle*, 34 *N.J.* 331, 169 *A.*2d 153 (1961), we interpreted a provision of the New Jersey Air Pollution Control Code (the Code) that had the exact same language. In *Roselle*, the Department of Health charged the operators of a refuse dump with a violation of the Code, which provided that "*[n]o person shall cause, suffer, allow or permit* open burning of refuse...." *Id.* at 336, 169 *A.*2d 153. (Emphasis added). That charge had resulted from the outbreak of fires of unknown origin, just like the fire at Alden Leeds. *Ibid.* Chief

Justice Weintraub, speaking for the Court, found that the defendants could not be found to have violated the statute (or the injunction issued thereto) without evidence that they somehow started the fires, stating:

> The word "cause" is clear enough, and if defendants had set the fires in question, their violation of the injunction would be plain, and the vagueness of the words "suffer, allow or permit" would not relieve them of responsibility. But plaintiff disavowed a charge that defendants started the fires and indeed disavowed knowledge of their origin.
>
> [*Id.* at 349–50, 169 *A.*2d 153.]

Although the "cause, suffer, allow or permit" language in the two regulations is identical, the majority criticizes the Appellate Division for applying the *Roselle* Court's interpretation to the language of *N.J.A.C.* 7:27–5.2(a). Even though the Code in *Roselle* targeted a more specific cause of air pollution—the open burning of refuse—than the regulation here—targeting emissions generally—the Court's treatment of the identical language in a similar environmental statute is significant precedent.

As stated by this Court in *Roselle*, it is evident that "cause" suggests some catalyst—some act or failure to act by the party charged with "causing" the emission which started, precipitated, or lead to the result—here the release of air contaminants into the atmosphere. If the fire were caused by Alden Leeds' negligent storing of the chemicals or, indeed, if the fire was the result of the spontaneous combustion of the chemicals, even properly stored, then I would find that Alden Leeds violated *N.J.A.C.* 7:27–5.2(a). In those situations, Alden Leeds' actions would have been a catalyst to the release of pollutants. For example, in *DeEugenio & Sons v. Division of Envtl. Quality*, 92 *N.J.A.R.*2d (EPE) 47, 1992 WL 257715 (1992), *aff'd*, No. A–4055–91T2 (App. Div. April 2, 1993), *certif. denied*, 134 *N.J.* 480, 634 *A.*2d 527 (1993), a peach farmer secured the necessary permits to burn peach tree trimmings. Due to wind change, the fire was responsible for the improper emission of smoke into the atmosphere and the farmer was deemed to have violated *N.J.A.C.* 7:27–5.2(a). Although the farmer did not act negligently, he did set the fire. *See also*

*Department of Health v. Concrete Specialties, Inc.*, 112 *N.J.Super.* 407, 410, 271 *A.*2d 595 (App.Div.1970) (finding that defendant whose equipment caused smoke to be emitted into air violated regulation promulgated under APCA because defendant allowed and permitted emission of smoke).

But the fire here was started by an unknown third person. Alden Leeds did nothing to cause the fire. There is no evidence that Alden Leeds either by an affirmative act or an act of omission "caused, suffered, allowed or permitted" the release. Causation is not established where the result would have occurred without any action on Alden Leeds' part. *State v. Jersey Central Power & Light Co.*, 69 *N.J.* 102, 111, 351 *A.*2d 337 (1976) (holding because nuclear power plant was only accelerating condition that would naturally have occurred, it was not charged with polluting creek in violation of *N.J.S.A.* 23:5–28). The mere storage of the chemicals by Alden Leeds was not the catalyst that caused the fire or the subsequent emission of contaminants into the air. By its plain language, *N.J.A.C.* 7:27–5.2(a) requires the DEP to show by a preponderance of evidence that Alden Leeds "caused, suffered, allowed or permitted" the release of the contaminants into the air. The DEP has failed to do so.

The majority analogizes *N.J.A.C.* 7:27–5.2(a) to common law strict liability for ultrahazardous activities. However, under common law strict liability, "[t]he strong current of authority" provides that forces of nature and actions of third parties that bring about damaging events from ultrahazardous activities relieve a defendant of liability. W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 79, at 563 (5th ed.1984). Therefore, the analogy to common law strict liability provides no support for a construction of *N.J.A.C.* 7:27–5.2a that would hold a defendant liable even when an unknown third party caused the release of pollutants.

### B.

The legislative history also supports my conclusion that the Legislature did not intend the DEP to have the authority to

conclude that the mere happening of a fire is sufficient to impose liability under *N.J.A.C.* 7:27–5.2(a). I recognize the importance of deference to an administrative agency's interpretations. Nonetheless, we have repeatedly held, "[a]n administrative agency may not under the guise of interpretation extend a statute to include persons not intended, nor may it give the statute any greater effect than its language allows." *Kingsley v. Hawthorne Fabrics, Inc.,* 41 *N.J.* 521, 528, 197 *A.*2d 673 (1964). The issue is not whether the DEP believes that it is good policy to fine an owner or operator merely because he lawfully and properly stored chemicals, but whether in 1969 when *N.J.A.C.* 7:27–5.2(a) was enacted, the Legislature intended and authorized the DEP to enact a regulation imposing such liability.

The predecessor of *N.J.A.C.* 7:27–5.2 was promulgated in 1960. *Ante* at 280, 708 A.2d at 1164. *N.J.A.C.* 7:27–5.2 was subsequently readopted and codified prior to September 1, 1969.[2] In 1969, the regulation was promulgated under *N.J.S.A.* 26:2C–8, which states "[t]he department shall have the power to formulate and promulgate, amend and repeal codes and rules and regulations preventing, controlling and prohibiting air pollution throughout the State. . . ." Neither the notification requirement of *N.J.S.A.* 26:2C–19(e), the criminal sanctions of *N.J.S.A.* 26:2C–19(f), nor the general fine provision of *N.J.S.A.* 26:2C–19(d) for violations of the APCA, had been enacted when *N.J.A.C.* 7:27–5.2(a) was promulgated. The only statutory authority under which the DEP could assess fines at that time was against those who failed to comply with DEP orders. Alden Leeds did not fail to comply with any DEP directive. Therefore, because when the DEP promulgated *N.J.A.C.* 7:27–5.2(a) it had no authority to fine a company for a release of pollution solely on the basis that the company stored chemicals, the majority's construction of the regulation exceeds the DEP's statutory authority.

---

[2] It is unclear when *N.J.A.C.* 7:27–5.2(a) was actually codified, as the subchapter historical note merely states that "all provisions of this subchapter . . . became effective prior to September 1, 1969."

Although the Legislature has strengthened the ability of DEP to control air pollution, it has retained the concept of "cause." For example, subsection e of *N.J.S.A.* 26:2C–19, which was enacted in 1985, provides:

A person who *causes* a release of air contaminants in a quantity or concentration which poses a potential threat to public health, welfare or the environment or which might reasonably result in citizen complaints shall immediately notify the department. A person who fails to so notify the department is liable to the penalties and procedures prescribed in this section.

[(Emphasis added).]

Therefore, to impose liability under either the statute or *N.J.A.C.* 7:27–5.2(a), the DEP must show by a preponderance of evidence that a party caused the emission of air contaminants into the atmosphere.

Under the Environmental Cleanup Responsibility Act, *N.J.S.A.* 13:1K–6 to –14 (ECRA), the Legislature imposed liability on the owner of property without regard to fault or causation. *N.J.S.A.* 13:1K–9. The ECRA was enacted in 1983, *L.* 1983, *c.* 330, in response to the problems and delays that arose because of attempts to allocate fault among several owners. As noted in *Superior Air Prod. Co. v. NL Industries, Inc.*, 216 *N.J.Super.* 46, 63, 522 *A.*2d 1025 (App.Div.1987), "[r]esponsibility for the contamination plays no part in the ECRA process. Non-compliance subjects the violator to strict liability for costs without regard to fault." Accordingly, under the ECRA, the Legislature clearly knew how to impose strict liability for a cleanup of a hazardous substance based solely on the ownership of the property, and did so under the ECRA. Likewise, *N.J.S.A.* 58:10–23.11(g) states that any person who "is in any way responsible for any hazardous substance [discharge into water] ... shall be strictly liable ... without regard to fault." That too indicates that when the Legislature intends to impose liability solely on the basis of ownership of the property, it does so in unmistakable language. It did not do so in *N.J.S.A.* 26:2C–19(e) and the DEP did not do so in *N.J.A.C.* 7:27–5.2(a).

Subjecting a party to civil penalties for a release of contaminants it neither volitionally nor even accidentally caused is a harsh

result. The intention to do so should be explicit from the regulations and from the enabling statute. Such a dramatic expansion of an agency's authority should be left to the Legislature and not the Commissioner.

## II

To summarize, the words "cause, suffer, allow or permit" presume some catalyst leading to an effect. As the Appellate Division recognized, "[t]he record is barren of any evidence that the manner in which appellant stored the chemicals was a cause of the fire." It was the fire, and whatever or whomever caused the fire, that must be viewed as the cause of the release of the contaminates into the air.

I concur in the Court's reversal of the DEP's claim under *N.J.S.A.* 26:2C–19(e). I would affirm the judgment of the Appellate Division.

Justice STEIN joins in this opinion.

*For affirmance in part and reversal in part*—Chief Justice PORITZ and JUSTICES HANDLER, POLLOCK, O'HERN and COLEMAN—5.

Concur in part and dissent in part—Justices GARIBALDI and STEIN—2.